In the Matter of Paul R. WEINSTEIN and Phoebe Weinstein, a/k/a Phoebe Blinder, Debtors.

**MINORITY EQUITY CAPITAL CORPORATION, Plaintiff,**

v.

**Paul WEINSTEIN, Defendant.**

**Bankruptcy No. 882–82307–17. Adv. No. 882–0821–17.**

United States Bankruptcy Court, E.D. New York.

July 13, 1983.

Schwartz, Sachs & Kamhi, P.C. by Able Jack Schwartz, Carle Place, N.Y., for defendant.

Stroock & Stroock & Lavan by Thomas Farber, New York City, for plaintiff.

## DECISION

BORIS RADOYEVICH, Bankruptcy Judge.

In its complaint filed November 29, 1982, the plaintiff Minority Equity Capital Corporation requests judgment in the sum of

$120,000 and a declaration that said debt is non-dischargeable. By answer filed February 10, 1983, the defendant, Paul Weinstein, denies the complaint's pertinent allegations and seeks dismissal of the complaint pursuant to Fed.R.Civ.P. # 12(b)(6). This matter came on for trial May 16, 1983, at which time both sides submitted their proofs and decision was reserved. Based upon the record presented, this Court makes the following.

## FINDINGS OF FACT

1. The plaintiff Minority Equity Capital Corporation (hereinafter MECCO), located at 275 Madison Avenue, New York, New York, is a corporation existing under the laws of the State of New York for the principal purpose of lending money to small businesses. *See* Plaintiff's Complaint; Transcript of May 16, 1983 at 3, 4 (hereinafter Tr. at " ").

2. QPL Components, Inc. (hereinafter "QPL"), located at 1 Commac Loop, Ronkonkoma, New York, is a corporation existing under the laws of the State of New York for the purpose of marketing and distributing various electrical components. *See* Finding of Fact # 1, *GECC v. QPL Components, Inc.,* 20 B.R. 342 (Bkrtcy.E.D. N.Y.1982).

3. The defendant, Paul Weinstein, was formerly the president and controlling shareholder of QPL. Tr. at 20.

4. General Electric Credit Corporation (hereinafter "GECC"), whose headquarters is located at 1011 High Ridge Road, Stamford, Connecticut is a corporation organized and existing under the laws of the State of Connecticut for the purpose of financing the acquisition of electrical component inventories. *See* Finding of Fact # 2, *GECC v. QPL Components, Inc., cite supra.*

5. GECC, acting in the capacity of a factor, financed QPL's inventory acquisition under a formula whereby GECC would make loans to QPL, for additional inventory, in an amount equal to 85% of QPL's outstanding accounts receivable and 50% of the value of QPL's eligible inventory. Tr. at 12, 28, 29. *See* Plaintiff's Exhibit IV.

6. Commencing in June of 1981, Weinstein initiated a fraudulent scheme to induce GECC to advance funds, over and above the limits set in its factoring agreement, by submitting invoices to GECC which misrepresented the value of QPL's inventory and accounts receivable. Tr. at 31–38, 63–65, 95.

7. Having reached the loan ceiling under its agreement with GECC during the summer of 1981, QPL approached MECCO seeking additional financing. Tr. at 5–6.

8. On October 29, 1981 MECCO, QPL, and Weinstein entered into an agreement which provided:

For valuable consideration and in reliance of the mutual promises and undertakings of each party

MECCO will =

A1) lend QPL $20,000 at 19% interest; pri[n]cipal to be repaid in 36 equal payments (monthly) beginning 1 Jan 1982; interest paid monthly beginning 1 Dec 1981

A2) guarantee repayment to GECC of QPL overadvance of up to $100,000

A3) secure guarantee to GECC with bank letter of credit of $100,000

QPL Components will =

B1) borrow $20,000 from MECCO upon terms set out in A1 above and will execute note and will secure the personal guarantee of such note by QPL Chairman and QPL President

. . . .

B5) pay 2% guarantee fee to reimburse MECCO for L/C cost

Paul Weinstein will =

C1) personally guarantee loan to QPL (# A1 above)

C2) personally guarantee that MECCO suffers no loss from its guarantee to GECC and/or related L/C

Plaintiff's Exhibit II.

9. A critical factor in MECCO's decision to guarantee and secure GECC's extension of an additional $100,000 line of credit was MECCO's assumption that QPL was not yet

above the pre-existing limits of GECC's factoring agreement. Tr. at 12, 80–81.

10. Based upon the assurances provided by MECCO's guarantee of GECC's overadvances, GECC extended an additional $100,000 in credit to QPL. Tr. at 31, 53–54, 77–78.

11. Pursuant to the agreement mentioned in Finding of Fact # 8, MECCO delivered a check for $20,000 to QPL on November 2, 1981. Plaintiff's Exhibit III. Tr. at 17, 21, 30.

12. After an investigation and audit conducted in December of 1981, GECC determined that QPL had submitted over $475,000 in fraudulently fabricated inventory and accounts receivable. The bulk of these invoices were submitted prior to MECCO's October 29, 1981 agreement. Plaintiff's Exhibit VII. Tr. at 31–49.

13. Thereafter on January 6, 1982, as provided for in the GECC factoring agreement, GECC declared QPL's loan in default and drew down on MECCO's letter of credit for the full $100,000. QPL has not reimbursed MECCO for any of the $100,000 which was paid to GECC. See Tr. at 53–54, 82, 83. See also Plaintiff's Exhibit XIII.

14. Pursuant to the provisions of the $20,000 promissory note, MECCO declared the loan in default and accelerated the balance due. QPL has failed to repay the $20,000 loan to MECCO. Tr. at 53, 86. See also Plaintiff's Exhibit IX.

15. Weinstein knew that no equity cushion in QPL's accounts receivable and inventory existed when he requested MECCO to provide an overadvance guarantee of the QPL/GECC factoring agreement. Tr. at 62–64.

16. Weinstein made no effort to advise MECCO of the lack of an equity cushion under the financing agreement with GECC although he knew that no such cushion existed and that over $475,000 in false and fraudulent invoices had been submitted to GECC.

17. Weinstein intended to deceive MECCO as to the existence of a QPL inventory and account receivables equity cushion.

18. MECCO reasonably relied upon the existence in QPL's inventory and accounts receivable of an equity cushion in making its decision to guarantee $100,000 of GECC's overadvances. Tr. at 80, 81, 110–112.

19. MECCO did not rely upon the existence of an equity cushion in QPL's inventory and accounts receivable in making its decision to directly loan QPL $20,000.

20. MECCO's $100,000 loss on its overadvance guarantee was the proximate result of Weinstein's intentional and fraudulent failure to disclose to QPL that there was no equity cushion under the financing agreement with GECC and that over $475,000 in false and fraudulent invoices had been submitted to GECC.

21. MECCO's $20,000 loss on its direct loan to QPL was not the proximate result of Weinstein's misrepresentations.

## CONCLUSIONS OF LAW

1. Weinstein's fostering of, and knowing failure to dispel, MECCO's misimpression as to the existence of the GECC equity cushion, was false pretense as defined in 11 U.S.C. § 523(a)(2)(A).

2. Weinstein's guarantee of the $100,000 debt owed to MECCO is non-dischargeable.

3. Weinstein's $20,000 direct loan guarantee debt owed to MECCO is dischargeable.

4. MECCO is entitled to a money judgment against Weinstein upon the $20,000 loan guarantee liability in the sum of $20,000.

5. At this time, MECCO is not entitled to a money judgment against Weinstein upon the $100,000 overadvance guarantee liability.

## MEMORANDUM

█ In seeking to prevent the discharge of its debt, MECCO first propounds a cause of action based upon 11 U.S.C. § 523(a)(2)(B). To prevail in this effort, MECCO must prove by clear and convincing evidence that Weinstein obtained

(2) ... money, property, services, or an extension, renewal, or refinance of credit, by—

   (B) use of a statement in writing—

     (i) that is materially false;

     (ii) respecting the debtor's or an insider's financial condition;

     (iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

     (iv) that the debtor caused to be made or published with intent to deceive;

*In re Newmark,* 20 B.R. 842 (Bkrtcy.E.D.N.Y.1982); *See also Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Danns,* 558 F.2d 114 (2d Cir.1977); *In re LoBosco,* 14 B.R. 739 (Bkrtcy.E.D.N.Y. 1981); *In re Paley,* 8 B.R. 466 (Bkrtcy.E.D. N.Y.1981).

The undisputed facts at bar are that in October of 1981 MECCO requested a written financial statement of Weinstein. What Weinstein submitted, and what MECCO accepted, was a previously executed financial statement which Weinstein had provided to European American Bank in connection with a totally unrelated financing transaction. The values given to Weinstein's real property in this statement totalled $460,000. The value of this property as indicated in the debtor's bankruptcy petition filed August 31, 1982 and given in depositions thereafter totalled approximately $310,000.[1]

After review of the record presented, this Court concludes that the plaintiff has failed to make out a § 523(a)(1)(B) *prima facie* case. There exists no evidence establishing that the involved financial statement was materially false; that it was submitted with an intent to deceive; or that the plaintiff reasonably relied upon it in making its loan decision.

In deciding that the approximately 30% real property valuation discrepancy does not involve an intentional misrepresentation, it is noted that the contrasting values were the estimates of a layman, and that they were adduced on dates approximately a year apart. In appraising the value of real property, one is confronted with a spectrum of possible valuations more so than a definitive number. Where along the spectrum one places the property's value depends upon the multifarious circumstances involved at the decisional moment. It must certainly be conceded that no intentional fraud can be evidenced solely from the tendency to choose the upper end of the valuation spectrum when applying for a loan and the lower end when filing for bankruptcy. When the above-mentioned factors are considered in tandem with the fact that land values have the capacity to fluctuate, it is doubtful whether an intentional misrepresentation occurred. *See generally In re Ostrer,* 393 F.2d 646 (2d Cir.1968); *Hartsfield Co. v. Smith,* 61 F.2d 723 (5th Cir.1932).

Assuming arguendo the existence of an intentional misrepresentation, the record reveals that it was neither material nor reasonably relied upon. What MECCO was seeking to ascertain in requesting a financial statement was whether Weinstein had sufficient personal assets to honor his guarantees if required to do so. Even accepting the deflated figures offered by MECCO, Weinstein still had more than enough unencumbered assets in September of 1981 to cover his guarantees. It is apparent that MECCO was so convinced of this fact that they did not require the debtor to submit formal appraisals, nor did they bother to perform an independent verification. This casual attitude is further established by the fact that MECCO accepted a copy of a financial statement which had previously been submitted to a different lender. Obviously the parties were dealing in general

---

1. MECCO's complaint additionally alleges that Weinstein fraudulently omitted a $65,000 mortgage liability owed to Connecticut Bank in his financial statement. As it is undisputed that this liability was based upon a guarantee and was contingent in nature at the time the statement was submitted, this allegation will be summarily disposed of in this footnote. *See* Tr. at 73.

"ball park" figures. In such an instance, a 30% valuation discrepancy is insufficient to rise to the level of a material misrepresentation. *See generally, Parker v. Johnson,* 279 F. 425 (E.D.N.Y.1922); *In re Lurie,* 385 F.Supp. 784 (E.D.N.Y.1974). As the purpose of the financial statement was to assure MECCO that Weinstein had sufficient assets to cover his guarantees, as Weinstein did have sufficient assets, and as there is no evidence to the effect that MECCO would not have made the loan without the additional 30% equity cushion, it can only be determined that MECCO did not reasonably rely on the accurateness of the involved financial statement.

■ The second theory offered by the plaintiff is that its debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[2] The five elements involved in proving this cause of action are:

1. The debtor made a false representation or pretense;
2. The misrepresentation was known by the debtor to be false;
3. The debtor intended to deceive "the plaintiff";
4. The creditor reasonably relied upon the debtor's representation;
5. The creditor sustained a loss as a proximate result of the debtor's misrepresentations.

*See In re Houtman,* 568 F.2d 651 (9th Cir. 1978); *In re Vickers,* 577 F.2d 683 (10th Cir.1978); *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540 (W.D.Va.1967) for origin of this test and *In re Newmark, cite supra; In re LoBosco, cite supra; In re Herman,* 6 B.R. 352 (S.D.N.Y.1980) for its application under the Bankruptcy Reform Act of 1978.

Were GECC standing in the guise of the plaintiff, it is undisputed that all the above elements would be met and the involved debt would be non-dischargeable. It is admitted that Weinstein submitted fabricated invoices to GECC, against which GECC loaned QPL money. The novelty of this case, and indeed the crux of Weinstein's defense, is that the admitted fraud was perpetrated upon GECC and not MECCO. It is argued that the defendant's misrepresentations are limited to the fabricated GECC invoices, that at the time the bulk [3] of them were submitted there was no intent to deceive MECCO, and that MECCO did not rely to its detriment upon the information within these invoices in making its loan decision.

■ This argument is flawed for the reasons that MECCO need not rely upon misrepresentations imputed from GECC's fraudulent invoices. The proof presented adequately establishes that Weinstein directly defrauded MECCO through the use of false pretense. As distinguished from false representation, which is an express misrepresentation; false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression. *In re Newmark, cite supra; In re Schnore,* 13 B.R. 249 (Bkrtcy.W.D.Wis. 1981); *In re Pommerer,* 10 B.R. 935 (Bkrtcy.D.Minn.1981); *See generally Stern v. National City Co.,* 25 F.Supp. 948, 957 (D.Minn.1938). It is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A). *See Llyod v. Industrial Bank of Commerce,* 241 F.2d 924 (2d Cir.1957); *In re Kisich,* 10 B.C.D. 626, 28

---

**2.** Section 523(a)(2)(A) provides:

A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

**3.** The submission of fraudulent invoices was a continuous scheme which ran from June through December of 1981. As MECCO did not enter the financing picture until October 29, 1981, it is recognized that any prior invoices could not have been submitted with intent to deceive MECCO. However, it is arguable that every invoice submitted after October 29th, 1981 was a direct fraud on MECCO as well as GECC. Fortunately this distinction need not be addressed as this case will be decided upon other grounds.

B.R. 401 (9th Cir.App.Pan.1983); *In re Newmark, cite supra; In re Neuman,* 13 B.R. 128 (Bkrtcy.E.D.Wis.1981); *In re Thomas,* 12 B.R. 765 (Bkrtcy.N.D.Ga.1981); *In re Pommerer, cite supra; In re Quintana,* 4 B.R. 508 (Bkrtcy.S.D.Fla.1980); *In re Milbank,* 1 B.R. 150 (Bankr.S.D.N.Y.1979). Case law has additionally gone so far as to extend an affirmative duty to a party in a business transaction to disclose all the facts the concealment of which would mislead the other side. *Peerless Mills, Inc. v. American Telephone & Telegraph Co.,* 527 F.2d 445 (2d Cir.1975); *See also In re Harris,* 458 F.Supp. 238 (D.Or.1978) aff'd 587 F.2d 451 (9th Cir.1978).

▊ In the case at bar it is uncontroverted that Weinstein was already well over his GECC loan limits prior to soliciting MECCO's assistance. Whether Weinstein expressly misrepresented to MECCO that he still had a cushion of 15% accounts receivable and 50% inventory is unclear from the testimony. However, such a statement is unnecessary. It is clear that on the basis of the QPL/GECC contracts presented by Weinstein, MECCO justifiably presumed the regularity of Weinstein's business practices and was accordingly under the impression that the involved security cushion existed. Weinstein knew of the false impression MECCO was under and did nothing to dispel it. This failure to reveal the existence of a prior fraud on GECC, when duty bound to do so, was in itself a direct fraud on MECCO. Such behavior indicates an intent to deceive through the use of false pretense.

The remaining elements to be discussed are whether MECCO reasonably relied upon the impression created by Weinstein's false pretense, and whether the creditor sustained a loss as the proximate result of the debtor's misrepresentation. MECCO argues that the $20,000 direct loan and the $100,000 credit guarantee were all part of a single financing transaction. It is asserted that neither the $100,000 guarantee nor the $20,000 direct loan would have been given but for the debtor's misrepresentation. Tr. at 112. While such a statement is believable with respect to the $100,000 guarantee, it is not with regard to the $20,000 direct loan.

The existence of GECC's 15% receivables and 50% inventory equity cushion necessarily runs to the heart of MECCO's guarantee decision. As MECCO would not have to pay on its overadvance guarantee until QPL's debt ran over the value of GECC's security, and as the testimony reveals that MECCO wanted this form of extra "belt & suspenders" protection (Tr. at 7), the equity cushion obviously was a determinative and relied upon factor. The fraud which created the illusion of available security is clearly the proximate cause of MECCO's loss as the equity cushion would have absorbed the $100,000 loss and as MECCO would not have otherwise advanced credit on such vulnerable terms. Accordingly, the non-dischargeability of the $100,000 overadvance guarantee debt is established.

The above situation is not applicable with respect to the $20,000 loan. The evidence presented does not convincingly establish that MECCO reasonably relied upon the existence of an equity cushion in making the decision to loan QPL $20,000, or that the non-existence of this equity cushion was the proximate cause of MECCO's $20,000 loss.

▊ The test to be applied in determining MECCO's reasonable reliance is whether the false representation was a sufficiently material consideration that in all probability the credit would not have been extended had the truth been known. *See In re Newmark, cite supra; In re Gany,* 103 F. 930 (S.D.N.Y.1900). Of course it is easy for MECCO to say, after the fact, that the entire financing transaction was based upon one decision, and that it would have been different had it been known that Weinstein was dishonest. However, the key factor is not whether MECCO relied upon Weinstein's honesty, but whether it relied upon the existence of an equity cushion in deciding to give the $20,000 loan. Viewing the circumstances in totality, the $20,000 loan appears to have little relationship with the fabricated invoices. Neither the $20,000

promissory note nor the $100,000 overadvance guarantee contain any conditional language requiring coexistence. Though each is a component of an overall financing package, the decision on whether to extend the $20,000 loan and/or the $100,000 overadvance guarantee appears to have been based upon separate considerations. The $20,000 loan was an unsecured advance, the consideration for which was QPL's payment of 19% interest and Weinstein's personal guarantee. It is hard to believe that a sophisticated finance company would have deemed the two unrelated loan transactions unseverable. While it is obvious that the existence of an equity cushion would figure heavily in the decision to extend an overadvance guarantee, the evidence presented does not even remotely suggest how this could have been a material consideration in deciding to directly loan the $20,000. From these facts, it can only be concluded that MECCO would have loaned QPL the $20,000 regardless of whether there existed a sufficient equity cushion.

■ The test to determine the element of proximate causation, is whether MECCO relied *to its detriment* upon Weinstein's false pretense. *In re Newmark, cite supra.* Proximate causation is established in this instance if MECCO can prove that, regardless of whether it was deceived into making the loan decision, the lack of the alleged equity cushion is what caused its $20,000 loss. MECCO's $20,000 loan position derived no additional benefit from the fact that their overadvance guarantee was secured by a cushion of inventory and receivables. Likewise, MECCO realized no additional detriment to their rights in collecting on the $20,000 note now that it is as-

certained that the involved security is non-existent. It is evident that the proximate cause of MECCO's loss involved its decision to give an unsecured loan. As the existence of the involved equity cushion had no impact upon this decision, a finding of proximate causation can not be justified.

Accordingly, this Court finds that MECCO did not reasonably rely upon Weinstein's equity cushion pretense in making its $20,000 loan decision, that said misrepresentation was not the proximate cause of MECCO's $20,000 loan loss, and that this aspect of Weinstein's debt to MECCO is dischargeable.

In its post-trial memorandum of law, the plaintiff asserts a third non-dischargeability cause of action sounding in subrogation.[4] This issue will not be considered as the plaintiff did not raise this issue in its complaint and as no motion to conform the pleadings to the proof presented has been made. *See* Fed.R.Civ.P. # 15(b).[5]

■ In addressing the issue of MECCO's entitlement to money judgments, this Court notes the different variety of guarantees given by Weinstein to MECCO. Where words of a guarantee do not otherwise specify, the guarantee is presumed to be one of payment. N.Y. UCC § 3–416(3). As the language of Weinstein's guarantee on the $20,000 loan indicates that it was absolute and that he would assume primary liability upon QPL's default, it is clearly a guarantee of payment entitling MECCO to a $20,000 judgment. However, Weinstein's overadvance guarantee provided that he would "guarantee that MECCO *suffers no loss*" (emphasis added) from MECCO's overadvance guarantee to GECC. Such language indicates secondary liability and creates

---

4. *See* 11 U.S.C. § 509(a) which provides that: an entity that is liable with the debtor on, or that has secured, a claim of a creditor, and that pays such claim, is subrogated to the rights of such creditor to the extent of payment.

The emerging case law interpreting this statute indicates that a subrogee has standing to assert a subrogor's right to have a debt declared non-dischargeable. *See In re Wade,* 26 B.R. 477 (Bkrtcy.N.D.Ill.1983); *In re Meek,* 25 B.R. 58 (Bkrtcy.D.Or.1982); *In re Dynda,* 19 B.R. 817

(Bkrtcy.M.D.Fla.1982); *In re Covino,* 12 B.R. 876 (Bkrtcy.M.D.Fla.1981). *See also Hartford Accident & Indem. Co. v. Flanagan,* 28 F.Supp. 415 (S.D.Oh.1939) and *dictum In re Dubose,* 22 B.R. 780 (Bkrtcy.N.D.Oh.1982).

5. It is also noted that even if properly raised, this cause of action is not dispositive of the situation presented. The within decision already establishes the non-dischargeability of the $100,000 overadvance guarantee debt.

only a guarantee of collection. This contract prevents resort to Weinstein until after MECCO exhausts its remedies against QPL. *See In re Wacht's Estate,* 32 N.Y.S.2d 871 (Sur.Ct.N.Y.Co.1942); *See generally Gonsenhauser v. Central Trust Co.,* 51 A.D.2d 664, 378 N.Y.S.2d 536 (4th Dept. 1976); N.Y.Jur., vol. 57, *Suretyship and Guaranty* § 81 at pg. 312. There being no evidence of MECCO's initial resort to QPL, a money judgment on this guarantee is premature.

Settle judgment in accordance herewith.