In re Beverly Louise FAULK, Debtor(s).

**SEARS ROEBUCK AND COMPANY, Plaintiff(s),**

v.

**Beverly Louise FAULK, Defendant(s).**

**Bankruptcy No. 84–40587.**
**Adv. No. 85–4009.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Aug. 18, 1986.

James Kocher, Marion, Ind., for plaintiff.

Frank McLane, Marion, Ind., for defendant.

**Findings of Fact, Conclusions of
Law and Judgment**

KENT LINDQUIST, Chief Judge.

## I

### Statement of Proceedings

This adversary proceeding came on for bench trial on the 3rd day of October, 1985,

pursuant to pretrial order of this Court on July 15, 1985.

The Plaintiff's complaint alleges that the scheduled indebtedness to it by the Defendant in the sum of $1,578.18 or in the alternative $1,609.57 is nondischargeable in bankruptcy on two alternative theories arising under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(C).

The first theory is that the Defendant obtained credit from the Plaintiff via a credit card by false pretense or actual fraud in that the Defendant made certain changes with such a card in contemplation of filing Bankruptcy and without the intention of paying therefore pursuant to 11 U.S.C. § 523(a)(2)(A). The second theory, is that the Defendant used the credit card to charge purchases for luxury goods within forty (40) days immediately preceeding the filing of her bankruptcy petition pursuant to 11 U.S.C. § 523(a)(2)(C).

The Defendant filed a specific denial to the Plaintiff's complaint on April 10, 1985, and the issues were closed.

## II

### Findings of Fact

The Defendant commenced her bankruptcy proceeding on the 21st day of December, 1984.

The parties filed their stipulated Group Exhibit No. 1. This Group Exhibit consisted of the Plaintiff's copies of eight (8) cash register statements and one (1) auditing copy of an invoice issued by the Plaintiff arising out of auto supplies and services sold and provided by Plaintiff to the Defendant.

The parties also filed their Stipulated Group Exhibit No. 2, which is the Plaintiff's "account itemization form" which reflects the balance the Plaintiff shows due and owing on the credit card account as shown in the Defendant's name. The Defendant stipulated that this exhibit accurately reflects the balance due and owing pursuant to the Plaintiff's records on the credit card account in the Defendant's name as being $2,789.88 at the time of the

Defendant's petition, and that purchases were made with the credit card issued in the Defendant's name in the sum of $1,578.18 between December 3, 1984 and December 19, 1984 which covers a period of 2 to 18 days prior to her bankruptcy. The Defendant expressly did not stipulate, however, that these changes were necessarily made by the Defendant personally or reflect her personal liability thereon.

The Defendant testified she is divorced, and has two children, Clifford, Jr. age 22, and Kimberly, age 19, living with her together with two grandchildren by her other children. Neither child is employed nor has any other source of income or support than the Defendant. They have resided with the Defendant since birth. She related that she had been on sick leave from her job since May of 1985 and previously filed bankruptcy in July of 1977.

The Defendant admitted that she applied for one credit card from the Plaintiff and that one card only was issued to her in her name alone. The Defendant could not recall what her authorized credit limit was with the Plaintiff or her highest average balance. The Defendant's schedule of creditors reflect a balance due to the Plaintiff of $3,500.00 as an unsecured, unliquidated creditor.

The Defendant indicated that she allowed her two children to occasionally use the credit card with her consent and in so doing they would sign her name. She further related that the children knew where she kept the card at home as she did not carry it on her person and at times the children would take the card without her prior authorization or knowledge and use the same for various purchases, which she would acknowledge as being her debt when billed for the same and which she would pay.

The Defendant stated the purchases were made for the benefit of her children or grandchildren as necessities and were not purchases for Christmas gifts.

As to stipulated Group Exhibit No. 1, the Defendant admitted the following items were purchased and the following charges

were incurred for the following purposes arising out of the use of the Defendant's credit card:

| | Items Purchased | Per Def. Purchased By | Amount | Purpose Per Def. | Date Purchased |
|---|---|---|---|---|---|
| 1. | One sweater, and two shorts | Defendant | $ 57.73 | for self or grandchild | 12/06/84 |
| 2. | Four nylon boots | Defendant | $104.96 | for self & daughter possibly grandchildren | 12/06/84 |
| 3. | Three gift sets & cologne | Defendant's daughters | $ 67.99 | for daughter | 12/06/84 |
| 4. | Black oxford shoes | Defendant | $ 26.24 | can't remember | 12/06/84 |
| 5. | Black boots | Defendant | $ 47.25 | can't remember, but for someone in household | 12/06/84 |
| 6. | Auto blanket | son | $ 31.49 | unknown | 11/23/84 |
| 7. | Lingerie and slacks | Defendant | $ 48.30 | self | 12/03/84 |
| 8. | Fashion accessories | unknown | $ 15.75 | unknown | 12/03/84 |
| 9. | Auto repairs (adaptor, muffler, pipe, etc.) | son | $ 95.32 | self | 12/03/84 |

The Plaintiff introduced into evidence Plaintiff's Group Exhibit No. 1 which consisted of the Plaintiff's copies of various charge slips that had not been stipulated to in stipulated Group Exhibit No 1. Upon being shown these charge slips the Defendant testified as follows regarding the purchases set out below.

| | Items Purchased | Per Def. Purchased By | Amount | Purpose Per Def. | Date Purchased |
|---|---|---|---|---|---|
| 1. | Men's outerwear (no description) | son or daughter | $ 57.74 | for son or daughter | 12/06/84 |
| 2. | Four Junior Shop items & jeans (no description | son or daughter | $ 83.96 | for son or daughter | 12/06/84 |
| 3. | Three Junior Shop items & two levi pants | son or daughter | $ 73.49 | for son or daughter | 12/06/84 |
| 4. | Auto blanket & coffee maker | does not know | $ 66.13 | Defendant admitted received | 12/07/84 |
| 5. | Men's outerwear | does not know | $ 71.39 | Does not know who received | 12/06/84 |
| 6. | Misc. | unknown | $ 52.59 | unknown | 12/06/84 |

The Defendant testified that her daughter was in a car accident and since she was liable therefore and had no insurance coverage, she was compelled to file this bankruptcy proceeding. She also related she was two months behind on her utility bill and one month behind on her real estate mortgage payment when she filed her petition. The Court takes judicial notice of the Defendant's schedule of creditors filed on the 21st day of December, 1984. The schedules reflect $22,000.00 in secured claims, and 20 unsecured creditors totaling $8,672.00 of which Sears was scheduled for $3,500.00 as unliquidated and which was the largest unsecured debt. Many of the other unsecured creditors are medical bills ranging from $26.00 to $2,139.00. There is scheduled a lawsuit versus the Defendant arising out of an auto accident which the Defendant asserts that she had joint liability with her daughter.

748

The Defendant's schedule further reflects assets composed of $3,000.00 equity in her real estate and $1,000.00 equity in tangible personal property.

The Defendant's schedule of current income and expenditures (exclusive of any allocation for the undersecured debts set out above) shows a monthly take home pay per month of $1,675.00 with $1,242.40 in expenses, the net difference being $433.00 a month.

The Defendant also reaffirmed her obligation to the Foster-Forbes Employees Federal Credit Union in the sum of $1,463.71. This creditor held the lien on her car.

Tom Wattenbarger, the collection manager for Sears, stated that the balance of the charge slips could not be located by the Plaintiff and thus though certain codes tell generally what types of merchandise and services had been obtained with the credit card, the specific types could not be ascertained. He further testified that the highest previous monthly balance of the Defendant was $1,238 in November, 1984, and that her previously established credit limit was $1,120.00. He also advised that the monthly statements to the Defendant advised her that she had exceeded her credit line and that he never received any complaints from the Defendant regarding her billings. Mr. Wattenbarger admitted on cross-exam however, that the January, 1985 billing for the December, 1984 purchases was probably not sent to the Defendant because of the automatic stay arising from the bankruptcy. No evidence was submitted that the Plaintiff ever attempted to revoke the Defendant's use and possession of the credit card or preclude further charges, although Wattenberger stated that the monthly charge card statements would indicate to the Defendant that the Defendant's credit line had been exceeded.

### Conclusions of Law and Discussion

At the outset the Court would like to note some basic legal principles that apply to adversary proceedings instituted by a creditor to have a debt determined to be nondischargeable pursuant to 11 U.S.C. § 523.

■ In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the debtor. *In re Linn*, 38 B.R. 762 (9th Cir.BAP 1984); *In re Marino*, 29 B.R. 797 (N.D.Ind.1983).

The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman*, 25 B.R. 545 (Bankr.S.D.Cal.1982).

This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan*, 46 B.R. 380 (Bankr.E.D.N.Y.1985); *In re Nicoll*, 42 B.R. 87 (Bankr. N.D.Ill.1984).

■ Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element, *In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983); *In re Bowers*, 43 B.R. 333 (Bankr. E.D.Pa. 1984); *Matter of Reinstein*, 32 B.R. 885 (Bankr. E.D.N.Y.1983); *In re Paley*, 8 B.R. 466 (Bankr. E.D.N.Y.1981).

The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions. *In re Marino*, 29 B.R. 797 at 799, *supra.*

■ The party objecting on the ground of fraud must establish each element of the claim by clear and convincing evidence. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985).

The Court in *Matter of Pappas*, 661 F.2d 82 (7th Cir.1981) in a case interpreting the predecessor to 11 U.S.C. 523(a)(2) (11 U.S.C. § 35(a)(2)), held that the bankruptcy court had exclusive jurisdiction to determine the meaning of false pretenses and false representations without having to look at Indiana state law. There have been only slight changes between 11 U.S.C. § 35(a)(2) and the present 11 U.S.C.

§ 523(a)(2) and thus the foregoing principle as to applicable law in a fraud case as set out in *Pappas* remains a correct statement of the law under the 1978 Code. *See, Birmingham Trust National Bank v. Case,* 755 F.2d 1474 (11th Cir.1985) where it was held because of the negligible differences, case law under the Act serves as a useful guide under the 1978 Code.

The cases construing the 1978 Code are consistent with the Act case of *Pappas,* and hold that the question of whether a debt is dischargeable is one of federal law. *In re Tapp,* 16 B.R. 315 (Bankr.D.Alaska 1981); *In re Liberati,* 11 B.R. 54 (Bankr.E. D.Penn.1981).

11 U.S.C. § 523(a)(2)(A) provides as follows:

### § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt— ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

11 U.S.C. § 523(a)(2)(C) further provides: [ (C) ] for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within twenty days before the order for relief under this title, are presumed to be non-dischargeable: "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act (15 U.S.C. 1601 et seq.); ...

The basic elements of the Plaintiff's claim which must be proved by clear and convincing evidence pursuant to 11 U.S.C. § 523(a)(2)(A) are as follows:

1. That the debtor obtained the money (property or services) through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitutes a wilful misrepresentation;

2. That the debtor possessed scienter, i.e. an intent to deceive; and

3. That the creditor relied on the false representation and the reliance was reasonable.

*In re Kimzey,* 761 F.2d 421, 423, *supra.*

■ As to the scienter element, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan (or otherwise part with property or services). *Id.* at 424.

■ Because direct proof of reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. *In re Kreps,* 700 F.2d 372, 375 (7th Cir.1983).

The actual reliance must be reasonable. The Seventh Circuit has held that the reliance test is not meant to "second guess a creditor's decisions to make a loan or set loan policy for a creditor". *Matter of Garman,* 643 F.2d 1252, 1258 (7th Cir.1980), *cert. denied sub nom. Garman v. Northern Trust Co.,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). In addition, the Court is not empowered to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices". *Id.* at 1256.

It is important to note the legislative history to 11 U.S.C. § 523(a)(2)(A). The relevant portion of the Senate Report is as follows:

Paragraph (2) provides that as under Bankruptcy Act section 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of cred-

it by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge.

Senate Report No. 95–595, 95th Cong., 2nd Sess. 77–79 (1978). Reprinted in 4 *Norton Bankruptcy Law and Practice,* Annotated Legislative History, § 523, page 396 (Callaghan and Company, 1983).

The relevant legislative statements are as follows:

[t]hus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition. Subparagraph (A) is intended to codify current case law e.g., Neal v. Clark, 95 U.S. 704 (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement. . . .

124 Cong. Rec. H11095–96 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978). Reprinted in 4 *Norton Bankruptcy Law and Practice,* Annotated Legislative History, § 523, page 397 (Callaghan and Company 1983).

■ There must be proof of positive fraud and this involves showing that the acts which constitute fraud involved moral turpitude or an intentional wrong; and fraud implied in law which does not require a showing of bad faith or immorality is insufficient. *In re Byrd,* 9 B.R. 357, 359 (Bankr.D.C.1981); *In re Montbleau,* 13 B.R. 47, 48 (Bankr.D.Mass.1981); *In re McAdams,* 11 B.R. 153, 155 (Bankr.D.Vt. 1980). *In re Gilman,* 31 B.R. 927, 929 (Bankr.S.D.Fla.1983); *In re Slutzky,* 22

B.R. 270, 271. Therefore, a mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under Section (a)(2)(A). *In re Emery,* 52 B.R. 68, 70 (Bankr.E.D.Pa.1985). However, if a debtor enters into a contract intending not to comply with its terms and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud *if the other remaining elements are satisfied. In re Taylor,* 49 B.R. 849, 851 (Bankr.E.D.Pa.1985); *In re Fenninger,* 49 B.R. 307, 310 (Bankr.E.D. Pa.1985).

■ It is also been correctly held that, by itself, a mere failure to fullfill a promise to pay for goods on credit is not fraudulent, so as to render a debt nondischargeable. *In re Salett,* 53 B.R. 925, 928 (Bankr.D.Mass.1985). However, when a debtor purchases goods on credit knowing he does not intend to pay for the goods or knowing he is unable to comply with the requirements of the contract, the debt may be nondischargeable. *Id.* at 928.

■ "Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. *In re Davis,* 11 B.R. 156, 158 (Bankr.D.Vt. 1980). However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact. *In re Slutzky,* 22 B.R. 270, 272 *supra; In re Frye,* 48 B.R. 422, 426 (Bankr.M.D.Ala. 1985); *In re Samford,* 39 B.R. 423, 427 (Bankr.M.D.Tenn.1984); *Matter of Weinstein,* 31 B.R. 804, 809 (Bankr.E.D.N.Y. 1983).

■ A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation. *Matter of Weinstein, Id.* at 809.

11 U.S.C. § 523(a)(2)(C) as set out above was added by the July 10, 1984 amendments to the Code pursuant to the Bankruptcy Amendments and Federal Judgeship Act. The reprinted legislative history as to that provision is as follows:

Sec. [307(a)]: Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by the code— that of loading up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection (d) creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under the circumstances that would make the debt nondischargeable. Only that portion of a debt which was incurred within the 40-day time period is subject to this presumption. The burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt. As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the presumption.

Senate Report Ho 98–65, 98th Cong., 1st Sess 58 (1985); Senate Report Accompanying S445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner of Bankruptcy Amendment Act of 1984.

Reprinted 4 *Norton Bankruptcy Law and Practice, Annotated Legislative History, § 523, P. 106* (1985 Annual Cummulative Supplement, Callahan and Company, 1983).

The Court in this case must also deal with the issue as raised by the Plaintiff of whether all or a portion of the goods or services purchased by the Defendant were "luxury" goods or services pursuant to 11 U.S.C. § 523(a)(2)(C) whereby if the indebtedness incurred for the same was within forty days before the Defendant's Order of Relief and in excess of $500.00 it is presumed to be nondischargeable.

Section 523(a)(2)(C) states what luxury goods and services are *not*. That is it does not include "goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor."

The legislative history to this section merely states, "as the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the exemption". 4 *Norton Bankruptcy Law and Practice Annotated Legislative History,* § 523, p. 106, *supra.*

 The term "luxury" is not defined in the Code or the Rules or the Legislative History. The exact word "luxury" is not defined in Vol. 25A *Words and Phrases,* Permanent Edition (West Pub. Co.). The only entry is for the word "luxuries" and while not defining the term itself this treatise cites the case of the *Mary F. Chisholm,* 133 Fed. 598, 600 (Me.1904), for the proposition that the term "luxuries" is an entirely relative term. This Court agrees that what is a luxury depends on the facts and circumstances of each case.

Luxury is not defined in *Black's Law Dictionary* (West Pub.Co. 5th Ed.)

The following definition has been given:

[2] a: An habitually sumptuous environment or way of life ... b: an elegant appointment or aid to the achievement of luxury ... c: a nonessential item or service that contributes to luxurious living: an indulgence or ornament or convenience beyond the indispensable minimum EXTRAVAGANCE ... 3: a means or source of pleasurable experience or personal satisfaction: COMFORT, SELF–INDULGENCE.

As an adjective "luxury" has been defined as; "of or relating to luxury or luxuries or catering to luxurious tastes: SUMPTUOUS, NONESSENTIAL....

*Webster's Third New International Dictionary,* unabridged, p. 1349 (Merriam-Webster, Inc. 1981).

 Thus if the Court finds that the Defendant purchased in *excess* of $500.00

in luxury goods and services within the 40 day period immediately preceding the Defendant's order for relief there is a *rebuttable* presumption that those purchases are nondischargeable. *Only that portion of the debt* actually incurred for luxury purchases *within* the 40 day period is subject to that presumption. *See,* 4 *Norton Bankruptcy Law and Practice, Annotated Legislative History,* § 523, p. 106, *supra.*

It is noted that the burden is rebuttable. Accordingly, since Bankruptcy Rule 9017 provides that the Federal Rules of Evidence are applicable to cases under the Code, Fed.R.Evid. 301 applies.

Thus, this presumption imposes on the party against whom it is directed the burden of going forward with the evidence to rebut or meet the presumption, but does not shift the burden of proof in this sense that the risk of nonpersuasion remains throughout the trial upon the party upon whom it was originally cast, i.e. the Plaintiff.

It should be carefully noted, that although the "bank" or "lenders" credit card, (*cf.* the two-party "sellers" credit card issued for use with one vendor only e.g. a department store) is really a three-party transaction between vendor, the Debtor, and a bank and a product of twentieth century consumer finance which has unique features, it is nevertheless a contractual obligation to pay money and no particular treatment was given the same under § 523(a)(2)(A). Despite this fact there has been a growing body of case law dealing with the use of credit cards some of which suggests that a determination of dischargeability of credit cards is different than the dischargeability of other debts for alleged false pretenses, false representations or actual fraud.

In the context of credit card fraud the following discussion by the court in *Matter of Carpenter,* 53 B.R. 724 (Bankr. N.D.Ga. 1985) is most helpful. There the court stated:

Section 523(a)(2)(A) provides that a debt is nondischargeable if it is one for "obtaining money, property, services, or an extension, renewal, or refinance of credit by—false pretenses, a false representation, or actual fraud...." In the context of a credit card debt, two lines of cases have developed.

The first line of cases is clearly the majority view. These cases hold that, when one uses a credit card, one is making an implied representation that he has the ability and intention to pay for the charge incurred. *See, e.g., American Bank and Trust Co. v. Lipsey (In re Lipsey,)* 41 B.R. 255 (Bankr.E.D.Pa. 1984); *Mid-American Nat'l. Bank and Trust Co. V. Higgs (In re Higgs),* 39 B.R. 181 (Bankr.N.D.Ohio 1984); *Montgomery Ward & Co. v. LaBuda (In re LaBuda),* 37 B.R. 47 (Bankr.M.D.Fla.1984); *Mercantile Trust Co. v. Schmidt (In re Schmidt),* 36 B.R. 459 (E.D.Mo.1983); *Montgomery Ward & Co., Inc. v. Borah (In re Borah),* 36 B.R. 535 (Bankr.M D.Fla.1983). "[A] credit card purchase made with knowledge by the purchaser of his inability or obvious lack of intent to pay is tantamount to obtaining property through false pretenses." *Montgomery Ward & Co. v. LaBuda,* 37 B.R. at 48.

The other line of cases is an outgrowth of the case of *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), cert. denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), in which the former Fifth Circuit Court of Appeals held that the Bankruptcy Act "does not except from discharge, debts created by obtaining credit through concealment of insolvency and present inability to pay." *Id.* at 191. The Eleventh Circuit Court of Appeals recognized the dramatic change in the debtor/creditor relationship with the wide-spread use of credit cards in the case of *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir. 1983). However, its noted that, although *Davison-Paxon* had been criticized, it has never been overruled. It went on to hold that *Davison-Paxon* retains its validity in the context of a one-on-one debtor/creditor relationship. In the context

of third-party transactions (i.e., credit card transactions), the analysis for nondischargeability "must be guided by the principles underlying *Davison-Paxon* that discharge exceptions are to be narrowly construed and that improvident creditors are not to be afforded special protections in bankruptcy for the assumption of common business risks." 701 F.2d at 932. The Court stated:

> Bearing in mind these considerations, we hold that the voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation. A card issuer, acting upon its own judgment, may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17a(2)'s exemption from discharge.

*Id.* (emphasis in original).

The *Roddenberry* case was decided under § 17(a)(2) of the Bankruptcy Act of 1898 which excepted from discharge "liabilities for obtaining money or property by false pretenses or false representations." The Court left open the question of whether the addition of the phrase "actual fraud" in the new Bankruptcy Code of 1978 would alter the result it reached. *Id.* at 929–30, n. 3.

Plaintiff urges this Court to follow the line of cases using the "implied representation" analysis. Most of the cases decided after Roddenberry do not discuss the case. *See, e.g., American Bank and Trust Co. v. Lipsey (In re Lipsey),* 41 B.R. 255 (Bankr.E.D.Pa.1984); *Central Bank v. Kramer (In re Kramer),* 38 B.R. 80 (Bankr.W.D.La.1984); *Montgomery Ward & Co. v. LaBuda (In re LaBuda),* 37 B.R. 47 (Bankr.M.D.Fla.1984). Other cases are highly critical of the decision. *See, e.g., Citibank v. Senty (In re Senty),* 42 B.R. 456 (Bankr.S.D.N.Y. 1984); *First Tenn. Bank v. Wilson (In re Wilson),* 32 B.R. 772 (Bankr.E.D.Tenn. 1983).

This Court, however, is bound by the holdings of the Eleventh Circuit, and, although *Roddenberry* was decided under the Bankruptcy Act of 1898, it remains of precedential value. The Eleventh Circuit has held that "[s]ince the differences between § 523(a)(2)(A) and its predecessor, § 17(a)(2) of the Bankruptcy Act, are negligible, case law construing § 17(a)(2) serves as a useful guide in applying § 523(a)(2)(A)." *Birmingham Trust Nat'l. Bank v. Case,* 755 F.2d 1474 (11th Cir.1985).

Therefore, this Court must decline to follow the "implied representation" analysis used by the majority of courts in nondischargeability cases involving the use of a credit card. To follow the majority, would be to ignore the guidelines set by the Eleventh Circuit. The "implied representation" analysis places credit card companies in a special category of creditors and makes their debts too easily nondischargeable. Generally, people use credit cards because they do not have the present ability to pay. In fact, this is how credit card companies make their profits. They charge high interest rates on the unpaid portion of their cardholders' accounts. "Banks are willing to risk nonpayment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits." *Roddenberry,* 701 F.2d at 932.

\* \* \* \* \* \*

This Court is, however, of the opinion that actual fraud, with which the Court in *Roddenberry* did not deal, will prevent a debt from being discharged. Where purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt must be held

to be nondischargeable pursuant to § 523(a)(2)(A). To hold otherwise would be to ignore the plain language of the statute and to reward dishonest debtors.

\* \* \* \* \* \*

Turning now to the facts in the case *sub judice*, it is clear that the Plaintiff never revoked Defendant-Debtor's credit card. Therefore, under the *Roddenberry* holding, the debt was not incurred through false pretenses or false representations. In an attempt to use the "implied misrepresentation" analysis, Plaintiff maintains that the Court must conclude that the Defendant-Debtor never intended to pay for the charges he incurred because the Defendant-Debtor was "hopelessly insolvent" during the period the charges were incurred.

\* \* \* \* \* \*

Plaintiff would have the Court "bootstrap" the fact that the Defendant-Debtor was having financial difficulty into intent to defraud Plaintiff. This is what is wrong with the "implied representation" analysis; intent to defraud is to easily implied from the fact a debtor was having financial problems.

Plaintiff also contends that "[b]y his use of the credit card, the Debtor represented that he would comply with this contractual agreement." "Trial Brief for the Plaintiff" at 22. Mere violations of any contractual provisions do not constitute fraud. *Roddenberry*, 701 F.2d at 932.

Under the Court's holding today, when one uses a charge card, one is representing that he has the present intention to pay for the charge incurred.

\* \* \* \* \* \*

This holding should in no way be interpreted to mean that the Court condones actual fraud in connection with the use of a credit card. Debts incurred through such fraudulent actions will be held to be nondischargeable. The Court simply holds that the "revocation rule" of *Roddenberry* applies, except where a creditor can prove by clear and convincing evidence that the debt was incurred through actual fraud, i.e., where the debtor made the charges with no intention of paying for them. The Court is cognizant of the fact that subjective intent is difficult to prove. However, it may be inferred from the actions of a debtor and all the attendant facts in a particular case.

*Id.* at 728–31.

The court in *In re Wilson*, 32 B.R. 772 (Bankr.E.D.Tenn.1983) also commented on the *Roddenberry* case as follows:

Although this court concurs in the observations in *Roddenberry* concerning the inherent risk assumed by the issuers of bank credit cards and the considerations which apparently make the risk worthwhile, the court is not bound by the holding in *Roddenberry*.

\* \* \* \* \* \*

Although the language of its holding is unequivocal, the *Roddenberry* court did note: "Debts incurred prior to unconditional revocation *may* be dischargeable." (Emphasis added.) *Roddenberry*, 701 F.2d at 928. If the *Roddenberry* holding provides that banking card purchases previous to receipt of notification of revocation of authorized use are dischargeable per se, without regard to actual fraudulent intent on the part of the card user, the holding may go too far. Code § 523(a)(2)(A) is unambiguous: Debts for obtaining property or services through actual fraud or false representations (other than through the use of a false financial statement) are nondischargeable.

*Id.* at 776.

This Court is in agreement with that Court's analysis. *See also, In re Holston*, 47 B.R. 103 (Bankr.M.D.La.1985) where the Court in discussing credit card fraud and the addition of the words "actual fraud" to § 523(a)(1)(A) of the 1978 Code, the Court stated:

*Davison-Paxon* was decided under a Bankruptcy Act; § 17(a)(2) of that statute merely provided that debts arising

from false pretenses or false representations were non-dischargeable. The Bankruptcy Code carries over those criteria, but *adds* "or actual fraud" as a grounds for non-dischargeability. *In Davison-Paxon* the Fifth Circuit read the prior statute literally to require proof of an overt act constituting a false pretense or an overt act constituting a false representation. The addition of "actual fraud" in the new statute, however, expands the scope of non-dischargeable debts to include those that arise from acts or *omissions* that are intentionally or consciously used to deceive or to trick another; an overt act is not necessary to actual fraud because an intentional or conscious omission can constitute fraud.

The holding of *Davison-Paxon* requires an overt act constituting a false pretense or an overt act constituting a false representation. In addition, *Collier* cites a legion of cases holding that "... fraud implied in law which may exist without imputation of bad faith or immorality is insufficient." Because of this requirement, many credit card cases have found that when a person presents a credit card, he makes an "implied" or a "constructive" representation that he has the means to pay the bill and that he intends to do so. But, to imply a representation that one knows to be false and then to base a decision on that implied false representation is simply a longer journey to the same destination; implied fraud. It is a journey that violates the spirit, if not the letter, of *Davison-Paxon*, *Boydston*, and *Wood* and the legislative history of § 523(a)(2)(A); it is a journey that is not necessary because of the statutory amendment.

The proper question under the Bankruptcy Code, then, is whether the debtor has intentionally employed or has consciously benefited from any conduct or omission that tricks or cheats the creditor. In effect, Congress has extended the statute to reach the conduct that Judge Sibley wished to reach in the dissent in *Davison-Paxon* "an intended deceit."

*Id.* at 107–08 (Footnotes omitted).

 This Court holds consonant with the *Carpenter* case *supra*, that the use of a credit card is *not* an *implied* representation that the Debtor-user has the *ability* to pay for the charges incurred for the purposes of § 523(a)(2)(A), but actual fraud may nevertheless prevent such a debt from being discharged, and thus where the purchases are made through the use of a credit card with *no intention at that time to repay the debt*, that debt may be held non-dischargeable pursuant to § 523(a)(2)(A). Stated in another way, the use of the credit card is a statement of a present intention to pay at the time of purchase rather than an unwritten representation of the ability to pay or financial condition.

 This finding of fact as to intention will obviously have to be determined by circumstantial evidence in most cases as direct evidence the Defendant's state of mind at the time of purchase is seldom expressly indicated. Although this is certainly a difficult task, it is no greater a task than any other cause of action that includes intent or state of mind as a necessary element. And the existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the Debtor which indicates he intended to deceive or cheat the creditor. *In re Fenninger*, 49 B.R. 307, 310, *supra; In re Taylor*, 49 B.R. 849, 851, *supra*. The Court may logically infer this intent not to pay from the relevant facts surrounding each particular case. *See, In re Kimzey*, 761 F.2d 421, 424, *supra*. And a persons intent, his state of mind, has been long recognized as capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact sufficient to support a fraud action. *In re Pannell*, 27 B.R. 298, 302 (Bankr.E.D.N.Y. 1983).

 To the extent however, that *Roddenberry* holds that an automatic "revocation rule" applies and that only after the

creditor has unequivocally and unconditionally communicated to the debtors a revocation of the debtor's right to possess and use the card will further use of the card result in liabilities by false pretenses or false representations that are non-dischargeable, while purchases previous to receipt of notification of revocation are dischargeable *per se* without regard to actual intent, the Court rejects that holding as contrary to the clear language of § 523(a)(2)(A). *See, First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932, *supra; See also, In re Shrader*, 55 B.R. 608, 612 (Bankr.W.D.Va.1985); *Matter of Moore*, 43 B.R. 370, 372 (Bankr.M.D.Fla. 1984).

This Court thus holds that proof of actual fraud can prevent such a credit card debt from being nondischargeable notwithstanding the fact there has been no such unequivocal and unconditional communication to the debtor to no longer possess or use the credit card. Thus, whether the use of a credit card *prior* to the unequivocal and unconditional communication by the creditor to the debtor-cardholder to no longer possess and use the credit card can result in nondischargeable liabilities must be determined on a case by case basis and the creditor must show by clear and convincing evidence that the debt was incurred through actual fraud, i.e. where the debtor made the charges with no intention of paying for the same.

On the other hand, this Court does agree with the *Roddenberry, Carpenter, Shrader* and *Moore* line of cases that hold that the continued use of the credit card by the debtor *after* an unequivocal and unconditional communication by the creditor to discontinue use and possession of the credit card for failure to pay as agreed on after the debtor's credit limit has been exceeded, renders the liabilities incurred after receipt of such unequivocal communication is nondischargeable pursuant to § 523(a)(2)(A). As pointed out by the *Roddenberry* Court:

> Purchases made with knowledge that one is not entitled to either use or possession constitute the type of deception intended to be exempted from discharge. It is more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the card.
>
> *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 937, *supra*.

This Court further holds that merely exceeding the credit limit is insufficient proof, in and of itself, that the debtor did not intend to pay the debt incurred on the credit card. *See, Matter of Robinson*, 55 B.R. 839, 845 (Bankr.S.D.Ind.1985); *In re Davis*, 42 B.R. 611, 615 (Bankr.E.D.Va. 1984). This is particularly true where the continued routine use of the credit card is in line with prior purchases and normal spending patterns. *See, In re Shrader*, 55 B.R. 608, 611 *supra*. And the creditors negligence in failing to prevent the debtor from using a credit card after the debtor reaches the credit limit is not a legally sufficient defense to the creditors objecting to discharge. *Matter of Hutchinson*, 27 B.R. 247, 252 (Bankr.E.D.N.Y.1983), *In re Vegh*, 14 B.R. 345, 348 (Bankr.S.D.Fla. 1981).

This Court also disagrees with the statement of the *Roddenberry* Court that "improvident creditors are not to be afforded special protection in Bankruptcy for the assumption of common risk." *First National Bank of Mobile v. Roddenberry*, 701 F.2d at 732, if the statement includes a debtor's transacting business in bad faith as a common business risk. *See, In re Senty*, 42 B.R. 456, 461 (Bankr.S.D.N.Y. 1984).

The Court however does not pass on the consequences of a debtor failing to pay the balance due on an unsolicited, pre-approved application for a credit card with a pre-approved line of credit where there is no evidence that the creditor had sent such an unsolicited application only to "preferred customers" who had demonstrated financial responsibility based on previous dealings with the creditor or approval was conditioned upon an inquiry into the debtor's financial condition as such no such evidence

is present here. For a discussion of those issues, *see Matter of Robinson*, 55 B.R. 839, 847–48, *supra*.

 The Court may consider a number of factors in determining whether a charge-card debt should be nondischargeable. The factors set out below are not deemed to be exclusive, or all be given equal weight, and as each decision must be case by case basis these factors may or may not be of assistance to the Court. These factors are as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Did the debtor make multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Matter of Carpenter*, 53 B.R. 724, at 730, *supra*.

 In applying the foregoing legal principles to the case at bar the Court must first make the evidentiary determination as to whether the Defendant purchased luxury goods and services in excess of $500.00 during the 40 days immediately preceding the Defendant's Order for Relief on December 31, 1985 so as to invoke the rebuttable presumption of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(C) and Fed.R.Evid. 301.

As noted in the findings of fact, many of the purchase slips were not made available by the Plaintiff and several of the purchase slips admitted into evidence made reference to certain generic descriptions that made it impossible for the Court to determine whether many of the relevant purchases were for luxuries or necessities.

At most, based on the evidence, the Court can only find that the three gift sets and cologne purchased on December 6, 1984 for $67.99, the fashion accessories purchased on December 3, 1984 for $15.75, the two auto blankets purchased November 22, 1984 for $31.49 and the auto blanket and coffee maker purchased on December 7, 1984 could be categorized as luxury items. The rest related to clothes, shoes, boots, etc. and there was no showing by the Plaintiff that these were of a type or nature or of a number that they could be characterized as extravagances or excessive indulgences rather than necessities reasonably required for the support on maintenance of the Defendant or a dependant of the Defendant.

Thus, there is in this case no rebuttable presumption that any of the purchases were nondischargeable pursuant to § 523(a)(2)(C) since the aforementioned luxury purchases did not exceed $500.00 within the 40 day time period.

The Court next turns to whether all or any portion of the Defendant's debt to the Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

The Defendant had an unpaid balance after the November 23, 1984 purchase of $31.49 of $1,181.81.

The bulk of the purchases after November 23, 1984 and prior to the Defendant's petition were made on just three days, namely, December 3, 1984, December 6, 1984, and December 7, 1984. And one final purchase was made on December 19, 1984 in the sum of $81.71 just two days prior to the filing of the Defendant's petition. The nature of this purchase is unknown.

Pursuant to the Plaintiff the Defendant's authorized line of credit was $1,120.00 and

the Plaintiff had allowed that line of credit to exceed the line in November, 1984, when the Defendant's highest monthly balance reached $1,238.00.

The total indebtedness of the Defendant pursuant to the Plaintiff was $2,789.88, and the Plaintiff asks that the sum of $1,609.57 be held to be nondischargeable. This figure represents substantially all those charges made from December 3, 1986 through December 19, 1986.

The clear and convincing evidence is that these charges totaling $1,609.57 were fraudulently made in that the circumstances surrounding these charges indicate that at the time the purchases were made there was no present intention to pay for the same.

All of the charges totaling the above sum were made within a period of only 2 to 18 days immediately preceding the filing of the Defendant's petition. During this time the Defendant or the Defendant's dependents with her express or implied consent, exhibited a great increase in buying activity comprised of an inordinate number of small purchases. The Defendant was unemployed, two months behind on her utility payments and one month behind on her mortgage payment and laid off from her place of employment and thus could not reasonably have been able to repay these charges at the contractually scheduled rate. Although many of the items purchased from December 3, 1984 through December 19, 1984 were not luxuries, the purchases did not reflect a normal purchasing pattern based on prior experience with the credit card nor in keeping with her predetermined credit line of $1,120.00 which was exceeded for the first time in November of 1984. The Defendant managed to exceed her credit line of $1,180.00 by some $1,600 based on purchases made primarily on three days only, i.e. December 3, December 6, and December 7, 1984. Multiple charges were made, i.e. eight on December 3, 1984, nine on December 6, 1984, and four on December 7, 1984.

In addition, the Court takes judicial notice of the dates the Defendant executed her voluntary petition, her unsworn declaration, and the acknowledgment by the Defendant of her notice from the Clerk advising of the various chapters under the Bankruptcy Code under which she could seek relief. They are all dated December 7, 1984. Thus, though the petition was not filed until December 21, 1984, it was clear on December 7, 1984 that the Defendant had already conferred with an attorney and intended to file bankruptcy. These documents were in fact signed on the same day some of the purchases were made with the Defendant's card.

Accordingly, the Court finds that the Defendant had no present intention to pay for the charges incurred between December 3, 1984 and December 19, 1984 and these charges were fraudulently made by the Defendant pursuant to 11 U.S.C. § 523(a)(2)(A). It is therefore,

ORDERED, ADJUDGED and DECREED, that the Defendant's liability to the Plaintiff is NON–DISCHARGEABLE in the sum of $1,609.57.