In re Robert E. DAVIS, Sr., Susan E. Davis, Debtors.

CITIBANK (NEW YORK STATE), Plaintiff,

v.

Robert E. DAVIS, Sr., Susan E. Davis, Defendants.

Bankruptcy No. 93–11792 B.
Adv. No. 93–1234 B.

United States Bankruptcy Court, W.D. New York.

Dec. 30, 1994.

Relin & Goldstein (Raymond Stillwell, of counsel), Rochester, NY, for plaintiff.

Brick, Brick, Elmer & Belczak, Daniel E. Brick, North Tonawanda, NY, for defendants.

## CARL L. BUCKI, Bankruptcy Judge.

It is a sure sign of financial distress when a consumer takes a cash advance on a credit card to pay the minimum installment due on other unsecured obligations. Unfortunately, personal involvement often obscures that which may be obvious to outsiders. At issue in this core proceeding is whether this practice nonetheless demonstrates actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A), so as to preclude a discharge of debt owed to the lender which provided the cash advance.

For Robert and Susan Davis, bankruptcy represented a final chapter in their personal struggle to deal with the restructuring of the economy of Western New York. Until his layoff in December of 1979, Mr. Davis was an employee of the Bethlehem Steel Corporation.[1] After a period of unemployment and reliance upon part time jobs, he finally secured a permanent position with an airline company. By 1991, in the face of its own financial difficulties, this new employer announced the need for cutbacks and its intent to seek wage concessions. Confronting the prospect of another layoff, Mr. Davis reluctantly accepted a transfer to Philadelphia in May 1991. Expecting to relocate, the Davises sold their home in August of that year. For personal reasons, however, the family chose to remain in Western New York. The debtors now reside in rented premises, while Mr. Davis commutes on a weekly basis to Philadelphia.

When the Davises sold their home, they used the proceeds to satisfy all of their then outstanding debts. In essence, they sacrificed their homestead exemption for the benefit of creditors. Among the beneficiaries of this action was Citibank, for an account on which the debtors would maintain a zero balance until early in 1993. Meanwhile, the Davises began to encounter financial difficulties. Although his employer provided free transportation to Philadelphia, Mr. Davis incurred the expense of maintaining a second household. Then, his union agreed to concessions that effectively reduced the debtors' income by 8 percent as of June 1992. Soon, Mr. and Mrs. Davis were falling further and further behind in meeting their financial obligations. The unpaid balances on a number

---

1. Once one of Western New York's largest employers, Bethlehem Steel Corporation gradually reduced its activity and ultimately discontinued all steelmaking operations in this region.

of their credit cards began to approach the borrowing limits. In January of 1993, the debtors started to write checks against their credit line with Citibank, the only lender with whom the debtors still possessed some meaningful capacity to borrow. In less than four months, however, the amount due to Citibank grew to a balance of $4,709.35. Having nearly exhausted this last source of credit, the debtors found that their cash flow was insufficient to satisfy their minimum monthly obligations. After consulting with counsel, Robert and Susan Davis filed a petition for relief under Chapter 7 of the Bankruptcy Code on June 7, 1993.

Citibank commenced the present adversary proceeding to determine the dischargeability of the obligation to repay monies that the Davises had borrowed beginning in January, 1993. It contends that at the time of the disputed advances, the debtors knew or should have known that their financial troubles would preclude repayment. In Citibank's view, the debtors committed fraud when they failed to disclose their change of circumstances prior to accepting the cash advances.

At trial, Mr. and Mrs. Davis testified that they had never intended to file bankruptcy. Rather, they believed that their financial affairs would improve if only Mr. Davis could be reassigned to Buffalo. Indeed, the debtors appear never to have fully considered the implications of their conduct. Perhaps most telling were the words of Susan Davis:

> "I mean, you're writing these checks out, you don't think. You just want to get everybody happy, I wanted to make everybody happy and I didn't want to make any moves to like file or do anything. I figured, oh, it would get better, something will turn up, and unfortunately, it just didn't work."

## Discussion

Section 523(a)(2) of the Bankruptcy Code provides that an Order of Discharge will not discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The parties acknowledge that the only issue now before this Court is whether the debtors' conduct constitutes actual fraud within the meaning of this statute.

The concept of actual fraud is particularly troublesome in the context of third party consumer credit. With little regard to levels of financial sophistication, the credit card industry has deluged virtually every adult American with invitations to become a charge customer. Many of these solicitations offer "preapproved" credit, whose extension requires nothing but a signature.[2] Lending practices almost encourage the misuse of credit, such as to finance existing debt service. For example, card holders are given "opportunities" for cash advances. In the present case, the Davises utilized "checks" that Citibank had provided to facilitate borrowing for the purpose of paying other obligations. Credit card issuers rarely investigate for changes in financial circumstances, or to assess whether unsecured debt has grown to imprudent levels. So long as they continue to pay the minimum balance due, borrowers can maintain an exemplary credit rating. This court fully agrees with the observation of Judge Kaplan in *In re Shanahan,* 151 B.R. 44, 47 (Bkrtcy.W.D.N.Y.1993), that although credit card issuers may assume many risks, they do not assume the risk of actual fraud. Nonetheless, the character of lending practice will necessarily affect the requirements for proof of actual fraud.

Courts and commentators have expressed widely divergent views regarding the requirements for proof of fraud in cases of credit card default. At a minimum, however, actual fraud requires intent either not to pay

---

**2.** Although the record does not indicate whether Citibank had issued a "preapproved" credit card, industry practices are relevant in assessing consumer expectations and the intent behind conduct occurring in the context of those expectations.

or in some fashion to deceive a creditor. As stated in 37 AM.JUR.2D *Fraud and Deceit* § 1, at 19 (1968), fraud "in its general sense, is deemed to comprise anything calculated to deceive." The Supreme Court has stated that fraud arises when "a party not intending to pay ... induces the owner to sell him goods on credit by fraudulently concealing his insolvency and his intent not to pay for them." *Donaldson v. Farwell*, 93 U.S. 631, 633, 23 L.Ed. 993 (1877). So too, Judge Learned Hand confirmed that "it is a fraud for an insolvent, concealing his condition, to buy goods, for which he does not mean to pay." *California Conserving Co. v. D'Avanzo*, 62 F.2d 528, 530 (2nd Cir.1933).

■ In a proceeding under section 523(a) of the Bankruptcy Code to determine the dischargeability of an obligation, the creditor carries the burden to establish a fraudulent intent. *See In re Shanahan*, 151 B.R. 44, 47. Citibank has presented no specific evidence of any intent of the debtors not to pay. Rather, the Davises testimony directly contradicts this conclusion. To establish its case, therefore, the lender must rely on an inference: that an intent not to pay may be inferred from the fact of their worsening financial circumstances.

■ In a commercial context, an intent to deceive may often be inferred from proof of financial inability to pay. For example, in a recision action, the Second Circuit found that by promising to pay for inventory, a buyer affirms that his intent has a reasonable hope of fruition. "If the buyer knows that it has no such hope, he deceives the seller, as much as though he intended not to pay at all." *California Conserving Co. v. D'Avanzo*, 62 F.2d at 530. Commercial transactions, however, entail a deliberative negotiation of specific terms, and may fairly be viewed as subject to standards of the marketplace. On the other hand, consumers may not necessarily share the same assumptions, particularly with respect to obligations arising in the current atmosphere of credit card use. It is necessary, therefore, to revisit the concept of inference, to determine whether any intention at all may be inferred from a consumer's inability to pay.

■ "An inference is a factual conclusion that can rationally be drawn from other facts."[3] As explained in the decision of this Court in *In re Contella*, 166 B.R. 26, 29 (Bkrtcy.W.D.N.Y.1994), an inference arises when the occurrence of a certain fact indicates and supports the occurrence of a particular conclusion. When facts give support to multiple conclusions, however, the probability of any one result is insufficient to permit an inference. In the absence of direct evidence of fraudulent intent, this court cannot infer fraud from conduct that is as likely to indicate a benign intent as to indicate a wrongful intent.

■ This Court accepts the fact, as described by counsel for Citibank, that the debtors "were in very deep financial trouble at the time of these advances." Presumably, Citibank would infer from this state of affairs that the debtors never intended to repay the cash advances. But it is at least equally reasonable to infer a desire to avoid bankruptcy and to fulfill all financial obligations. The debtors made no extraordinary purchases. They did not use the credit to build equity in an exempt asset. In fact, they received no benefit, in terms of goods or services, from this final attempt to keep their financial ship afloat. Rather, these efforts merely substituted new obligations for old ones, prolonged the agony of their fiscal troubles, and delayed further the relief of a fresh start in Chapter 7. Under these circumstances, it would be unfair to infer the wrongful intent that is a necessary element of actual fraud.[4]

---

3. C. Fishman, Jones on Evidence, Civil and Criminal § 4.1, at 299 (7th Edition 1992).

4. Indicative of the debtors' lack of wrongful intent was their previous use of the proceeds of their home sale to satisfy unsecured obligations in full. While supportive of the Court's decision, however, this history is not required for the conclusion that the plaintiff has failed to satisfy its burden of proof as to intent.

Nothing in this opinion should preclude a creditor from establishing, through specific evidence, the necessary elements of proof of actual fraud. Creditors may face a particular challenge to demonstrate a consumer's intent not to pay an indebtedness. Section 523(a) was designed, however, to preclude discharge only in certain egregious circumstances. Absent a clear showing of wrongful motive on the part of the consumer debtor, discharge is appropriate.

For the reasons stated herein, the obligation of Robert and Susan Davis to Citibank shall be discharged. Accordingly, the Clerk is directed to enter judgment for the defendants.

So Ordered.