In re Matthew C. TINNEY, D.O., Debtor.

**BARNETT BANK OF PINELLAS COUNTY, Plaintiff,**

v.

**Matthew C. TINNEY, Defendant.**

**Bankruptcy No. 93–00234–8G7.
Adv.No. 93–212.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

June 29, 1995.

Scott W. Spradley, Orlando, FL, for Plaintiff.

Ginnie Van Kesteren, St. Petersburg, FL.

Philip D. Storey, Orlando, FL.

Pat Chalker, Jacksonville, FL.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Bankruptcy Judge.

**THIS IS** a Chapter 7 liquidation case and the matter under consideration is the dischargeability of a debt admittedly due and owing by Matthew C. Tinney (the "Debtor") to Barnett Bank of Pinellas County ("Barnett"). Barnett's claim of nondischargeability is brought in a two count complaint based on § 523(a)(2)(A) of the Bankruptcy Code. Barnett alleges that the Debtor knew that he would be unable to repay cash advances on his credit card and cash advances on his credit line at the time they were incurred. In his Answer, the Debtor denies Barnett's allegations and a final hearing was held on the complaint.

The Debtor, an osteopathic physician, graduated from medical school in 1989, and completed his internship at University General Hospital in Seminole, Florida, in June, 1990. The Debtor then acquired a private practice in Seminole, and also worked as an emergency room physician with a group under contract to University General Hospital. The Debtor's private practice did not generate the income indicated in the seller's financial projections, and the Debtor was forced to use his income from the hospital to support his private practice. However, the hospital required him to maintain the private practice as a condition to receiving hospital privileges.

In May, 1992, the Debtor moved the location of his private practice, and this resulted in further financial problems for the practice. The Debtor's tax payments became significantly overdue. The Debtor met with a bankruptcy attorney on October 27, 1992. Waiving the attorney-client privilege, the Debtor testified candidly about this meeting. The Debtor testified that after this meeting he concluded that he did not wish to file a bankruptcy petition. Very soon thereafter the I.R.S. levied on a money market account of the Debtor. In early November, the Debtor obtained the following cash advances and used the cash to pay the I.R.S.: $2,500 from a Barnett credit card, $1,600 from a Barnett credit line, and $7,700 from an MBNA America ("MBNA") credit card. These transactions were posted on different dates, but the Debtor testified that they occurred within a few minutes of each other. The Debtor utilized all available credit for these advances, so that he could pay as much as possible to the I.R.S. The Debtor did not make any payments to Barnett or to MBNA for these charges.

In December, 1992, the Debtor learned that the person through whom he contracted with the hospital had lost the contract with the hospital, and therefore his subcontract would be terminated. This came as a complete surprise to the Debtor.

The Debtor began the process of closing his family practice, began seeking work with other hospitals, went back to the bankruptcy attorney, and on January 8, 1993, filed a voluntary petition for relief under Chapter 7.

The Debtor's Schedules and Statement of Financial Affairs indicate that his income for 1991 was $62,000 and that his income for 1992 was $70,000. Based upon his Schedules, the Debtor has no real property but he has personal property worth $46,225. A large portion of the personal property consists of accounts receivable scheduled with a value of $25,000 although there is "doubtful collectability." The Debtor has $89,002.34 in secured debts, $30,000 in unsecured priority tax claims, and $251,478.63 in unsecured nonpriority claims, the majority of which are related to student loans and costs incurred in running his family practice. The Debtor's monthly expenses were $3,995, while his monthly income was only $3,350.

The Debtor was never notified prior to incurring the charges in question that his credit privileges were revoked.

Barnett claims that at the time the Debtor incurred the charges he had no intention of

ever repaying the charges. As of October 1992, the balance on the credit card account was $2,473.33, and the balance on the credit line was $8,398.47. Barnett asserts that the Debtor obtained the November 1992 cash advances after he consulted with his bankruptcy counsel, with the knowledge that the debt owed to the I.R.S. was nondischargeable, and with the intention of turning that nondischargeable tax debt into dischargeable bank debt.[1]

■■■ An underlying principle in the analysis of dischargeability issues is that bankruptcy is designed to provide a fresh start for honest debtors who unexpectedly fall into financial difficulty. *See In re First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). By excepting certain debts from the discharge, benefits of the bankruptcy laws are not extended to those whom the laws were not intended to protect. *See Id.*

Section 17a(2) of the Bankruptcy Act of 1898 provided an exception to the discharge "for obtaining money or property by false pretenses or false representations...." Interpreting the exception of § 17a(2), the Eleventh Circuit Court of Appeals in *Roddenberry, supra,* established a standard for analyzing credit card debts obtained by false pretenses or false representations. In that case, the Eleventh Circuit considered the 1940 holding of the Fifth[2] Circuit Court of Appeals in the case of *In re Davison–Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), cert. denied 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941). In *Davison–Paxon,* a divided panel of the former Fifth Circuit concluded that the purchase of goods on credit, with an intentional concealment of insolvency at the time of purchase, was not exempt from the general discharge of the Bankruptcy Act of 1898 under the exception of § 17a(2) for obtaining money by false pretenses or false representations. In *Rodden-*

*berry,* the court held that although the intentional concealment of insolvency will not render a debt nondischargeable, the continued use of a credit card after clear revocation of the credit card has been communicated to the cardholder will result in liabilities obtained by false pretenses or false representations.

... Purchases made with knowledge that one is not entitled to either use or possession constitute the type of deception intended to be exempted from discharge. It is more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the card.

... Debts arising prior to the communication of revocation are part of the risk assumed by the bank. During this period, the bank risked nonpayment by authorizing conditional possession of the cards. This risk was assumed despite the Roddenberrys' apparent inability to pay, and the credit they obtained during this period was implicitly authorized by the bank. However, once the unequivocal revocation of credit privileges was communicated, the bank no longer agreed to assume this risk. Beyond the point of revocation, Mrs. Roddenberry was not merely concealing an inability to pay, but rather was affirmatively defrauding the bank with whom she no longer had any type of relationship.

*Roddenberry,* 701 F.2d at 932, 933.

... Upon reviewing the scope of Davison–Paxon, we conclude that the rule enunciated in the decision does not warrant mechanical application. Instead, each case involving modern credit transactions must be examined individually to determine if the challenged liability is of the type anticipated to be discharged in Davison–Paxon. It is our conclusion that in transactions involving bank credit cards

---

**1.** The Debtor filed his petition on January 8, 1993. Accordingly, provisions of the Bankruptcy Reform Act of 1994 which make this type of debt nondischargeable are not applicable. *See* § 702(b) of the Bankruptcy Reform Act of 1994.

**2.** Which cases prior to October 1, 1981, are precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir. 1981).

the analysis must involve a determination of whether the bank unconditionally revoked the cardholder's right to use and possession of that card and if so when the cardholder became aware of such revocation. Debts incurred prior to unconditional revocation may be dischargeable. However, debts incurred with the knowledge that one is not entitled to possession or use of a credit card are nondischargeable.

*Roddenberry,* 701 F.2d at 928.

The Bankruptcy Code, which replaced the Bankruptcy Act, provides at § 523(a)(2)(A) the following exception from the discharge:

11 U.S.C. § 523. Exceptions to discharge

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.　　.　　.　　.　　.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud....

In *Schweig v. Hunter,* 780 F.2d 1577 (11th Cir.1986), the Eleventh Circuit considered the dischargeability of a debt under § 523(a)(2)(A), and stated:

In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove that: the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation.... The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.

.　　.　　.　　.　　.

In spite of Schweig's protestations to the contrary, *Davison–Paxon Co. v. Caldwell,*

115 F.2d 189 (5th Cir.1941), cert. denied 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), remains the law of this circuit on failure to disclose and states that "not making full disclosure ... is not within the exception." The court was clear that there must be actual overt false pretense or representation to come within the exception. The absence of explicit representations ... requires a holding that there have been no false pretenses or false representations. *Id.*

*Hunter,* 780 F.2d at 1579, 1580.

In the decade following *Roddenberry* and *Hunter,* bankruptcy courts in the Eleventh Circuit have considered the principles set out in those cases as well as the principles of establishing actual fraud, and have developed a body of case law dealing with the use of credit cards prior to filing a bankruptcy.

... The Roddenberry case was decided under § 17(a)(2) of the Bankruptcy Act of 1898 which excepted from discharge "liabilities for obtaining money or property by false pretenses or false representations." The Court left open the question of whether the addition of the phrase "actual fraud" in the new Bankruptcy Code of 1978 would alter the result it reached. Id., at 929–930, n. 3.

.　　.　　.　　.　　.

This Court is, however, of the opinion that actual fraud, with which the Court in Roddenberry did not deal, will prevent a debt from being discharged. Where purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt must be held to be nondischargeable pursuant to § 523(a)(2)(A). To hold otherwise would be to ignore the plain language of the statute and to reward dishonest debtors. In order to prove actual fraud, a creditor must establish the following five elements:

1. that the debtor made representations;

2. that at the time he knew the representations were false;

3. that he made them with the intention and purpose of deceiving the creditor;

4. that the creditor reasonably relied on such representations;

5. that the creditor sustained the alleged damages as a result of the misrepresentation.

.    .    .    .    .

Under the Court's holding today, when one uses a charge card, one is representing that he has the present intention to pay for the charge incurred. Plaintiff argues that Defendant–Debtor misrepresented that he had the intent to pay for the charges he incurred. Plaintiff lists factors which other Courts have considered in deciding whether a debtor had the intention to pay for charges. These include:

1. the length of time between the charges made and the filing of bankruptcy;

2. whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. the number of charges made;

4. the amount of the charges;

5. the financial condition of the debtor at the time the charges were made;

6. whether the charges were above the credit limit of the account;

7. did the debtor make multiple charges on the same day;

8. whether or not the debtor was employed;

9. the debtor's prospects for employment;

10. financial sophistication of the debtor;

11. whether there was a sudden change in the debtor's buying habits; and

12. whether the purchases were made for luxuries or necessities.

*In the Matter of Carpenter,* 53 B.R. 724, 728–730 (Bankr.N.D.Ga.1985).

The discussion of *Roddenberry, Davison–Paxon,* and *Carpenter,* as well as other cases, in the case of *In re Faulk,* 69 B.R. 743 (Bankr.N.D.Ind.1986) is excellent. While *Faulk* was not decided by a court in the Eleventh Circuit, its analysis of law in the Eleventh Circuit is instructive.

Other bankruptcy courts in the Eleventh Circuit have also taken the position that *Roddenberry* does not preclude an analysis of actual fraud in credit card transactions. *See,* for example, *In re Nogami,* 118 B.R. 846 (Bankr.M.D.Fla.1990); *In re McCubbin,* 156 B.R. 94 (Bankr.M.D.Fla.1993); *In re Landen,* 95 B.R. 826 (Bankr.M.D.Fla.1989).

These positions are not inconsistent with the Code. Section 523(a)(2)(C) states that for the purposes of § 523(a)(2)(A), consumer debts to a single creditor aggregating more than $1,000.00 for luxury goods or services incurred within 60 days before the petition, or cash advances aggregating more than $1,000.00 for consumer credit within 60 days before the petition, are presumed to be nondischargeable. This is a presumption of nondischargeability based on false pretenses, false representations, or fraud; it is not a per se rule. By this treatment, Congress acknowledged the possibility that these types of debts might not be dischargeable, and established presumptions for certain amounts and certain periods of time.[3]

■ No single factor is determinative. Instead, the Court must consider the totality of

---

**3.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985) (Senate Report accompanying S445, Omnibus Bankruptcy Improvements Act of 1983, which was a forerunner to the Bankr.Amend.Act of 1984), stated:

Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by

the code—that of loading up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection (d) creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under the circumstances that would make the debt nondischargeable.

the evidence and make the determination of intent on a case-by-case basis. *See Landen,* 95 B.R. at 829. Accordingly, the Court must focus on factors which indicate the debtor's intent to repay the debt at the time the charges or cash advances were incurred.[4]

■■ Because of the very nature and philosophy of the bankruptcy law, the exceptions to discharge are to be construed strictly. *See Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). The burden of establishing nondischargeability of a debt is on the party challenging the dischargeability. *See Hunter,* 780 F.2d at 1577. That party must prove nondischargeability by the preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The Debtor testified that at the time the cash advances were made, he believed that his practice would begin to show profits. This belief was reasonably based. In conjunction with the hospital and the purchase of the practice, the Debtor had access to business consultants who encouraged him to continue the practice. Additionally, in conjunction with the loan for the purchase of the practice (a portion of which will be discharged by this case), the lender (also a Barnett bank) required the Debtor to retain an accountant to prepare financial statements, and the accountant also encouraged the Debtor to continue the practice. The Debtor's intent in obtaining the cash advances was to keep the I.R.S. from continuing to levy on his assets so that he could keep his practice. It was several weeks after the cash advances were made that the Debtor learned that the contract with University General Hospital would be canceled and that his group would no longer be employed by the hospital. That event was the impetus for the Debtor's bankruptcy case. The Debtor did not use either the Barnett credit card, the Barnett credit line, or the MBNA credit card after he found out his position at the hospital would be terminated.

The availability of credit for difficult financial times is one very good reason to establish credit.[5] The test for nondischargeability is not whether the credit was used in difficult times; the test for nondischargeability is whether the credit was used with the intent not to repay.[6]

In this case, the Court cannot conclude that the Debtor used the credit with the

---

Only that portion of a debt which was incurred within the 40–day time period is subject to this presumption. The burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt. As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the presumption.

4. The Bankruptcy Reform Act of 1994 has made debts incurred to pay nondischargeable taxes to the United States nondischargeable, per se. As mentioned above, however, the provisions of the Bankruptcy Reform Act of 1994 are not applicable to this case.

5. *See In re Cordova,* 153 B.R. 352, 356 (Bankr. M.D.Fla.1993).

6. Again, *In re Faulk,* 69 B.R. 743 (Bankr. N.D.Ind.1986), is instructive.

This Court holds consonant with the *Carpenter* case supra, that the use of a credit card is not an implied representation that the Debtor-user has the ability to pay for the charges incurred for the purposes of § 523(a)(2)(A), but actual

fraud may nevertheless prevent such a debt from being discharged, and thus where the purchases are made through the use of a credit card with no intention at that time to repay the debt, that debt may be held non-dischargeable pursuant to § 523(a)(2)(A). Stated another way, the use of the credit card is a statement of a present intention to pay at the time of purchase rather than an unwritten representation of the ability to pay or financial condition. *Id.,* 69 B.R. at 754.

Although the use of the card is not a representation of ability to pay, in some circumstances the inability to pay may be evidence of the intent not to pay. This is factor no. 5 on the list of factors set out in *Carpenter.* However:

The holding of *Davison–Paxon* requires an overt act constituting a false pretense or an overt act constituting a false representation. In addition, Collier cites a legion of cases holding that "... fraud implied in law which may exist without imputation of bad faith or immorality is insufficient." Because of this requirement, many credit card cases have found that when a person presents a credit card, he makes an "implied" or a "constructive" representation that he has the means to pay the bill and that he intends to do so. But, to imply a representation that one knows to be false and

intent not to pay for the charges. The Debtor's testimony on all material points was candid and credible. The Court believes that the Debtor did not pay the nondischargeable taxes with dischargeable debt with the intent to file bankruptcy and discharge the debt, but that the Debtor paid the taxes utilizing all of the credit he had available at the time to keep the I.R.S. from levying further against his assets and to enable him to continue his private practice. Accordingly, the debt admittedly due and owing by the Debtor to the Plaintiff should be discharged.

A separate Final Judgment will be entered in accordance with the foregoing.

then to base a decision on that implied false representation is simply a longer journey to the same destination; implied fraud. It is a journey that violates the spirit, if not the letter, of *Davison–Paxon, Boydston,* and *Wood* and the legislative history of § 523(a)(2)(A); it is a journey that is not necessary because of the statutory amendment [in 1984].

The proper question under the Bankruptcy Code, then, is whether the debtor has intentionally employed or has consciously benefitted from any conduct or omission that tricks or cheats the creditor. In effect, Congress has extended the statute to reach the conduct that Judge Sibley wished to reach in the dissent in *Davison–Paxon*: "an intended deceit." *In re Holston,* 47 B.R. 103 (Bankr.M.D.La.1985).

*Id.,* 69 B.R. at 755.