In re Peter Andrew POOR and Jeannie Marie Poor, Debtors.

CHASE MANHATTAN BANK USA, N.A., Plaintiff,

v.

Jeannie Marie POOR, Defendant.

Bankruptcy No. 97–11274.
Adversary No. 97–1084.

United States Bankruptcy Court, D. Maine.

April 3, 1998.

Jeannie Marie Poor, East Corinith, ME, Pro se.

Peter Andrew Poor, East Corinith, ME, Pro se.

Michael J. Gartland, Verrill & Dana, Portland, ME, for Plaintiff.

Gary M. Growe, Bangor, ME, Trustee.

### Memorandum of Decision

JAMES B. HAINES, Jr., Bankruptcy Judge.

Plaintiff, Chase Manhattan Bank USA, N.A. ["Chase"], seeks summary judgment on Count I of its § 523(a)(2) complaint against *pro se* debtor Jeannie Poor. Chase asks that judgment be entered declaring that the obligations created by two transactions—a $3,400.00 balance transfer and a $350.00 credit cash withdrawal—are excepted from Poor's Chapter 7 discharge. It argues that the debts come within § 523(a)(2)(C)'s nondischargeability presumption and that Poor has not effectively rebutted the presumption in her summary judgment response.

For the reasons set forth below, I conclude that the $3,400.00 balance transfer is not a "cash advance" within the meaning of § 523(a)(2)(C). Furthermore, the $350.00 withdrawal, standing alone, does not come under § 523(a)(2)(C) because it does not exceed the statutory presumption's $1,000.00 threshold. Thus, Chase's motion for summary judgment is denied.[1]

### Procedural Background

Chase's summary judgment motion was filed shortly after the pretrial conference, accompanied by a statement of uncontested material facts, a supporting memorandum of law, replete with six exhibits and two affidavits—one from a vice president of Chase and the other from Chase's counsel. Chase's motion comports with pertinent rules governing summary judgment practice. *See* Fed. R.Civ.P. 56; Fed.R.Bankr.P. 7056 (incorporating Fed.R.Civ.P. 56); Me.D.Ct.R. 56 (requiring summary judgment movant to provide "a separate, short and concise statement of material facts"); D.Me.L.Bankr.R. 7056–1(a) ("The requirements of District Court Rule 56 govern the form of all summary judgment motions in adversary proceedings in this district.").

Notwithstanding my pretrial conference caution to Poor, a *pro se* litigant, that she would be expected to respond to Chase's motion in accordance with pertinent rules and that she would likely have to prepare and file an affidavit to support her position, her response is inadequate. Her rejoinder, entitled "Defendants [sic] Answer to Complaint," is but a bundle of unverified assertions and unauthenticated documents. It does not comply with the requirements of Fed.R.Civ.P. 56(e) or Me.D.Ct.R. 56.[2]

### Summary Judgment Standard

Chase may prevail only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that [Chase, as] the moving party[,] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995); *Winters v. Federal Deposit Ins. Corp.*, 812 F.Supp. 1, 2 (D.Me.1992). At the summary judgment

---

**1.** This memorandum of decision sets forth conclusions of law in accordance with Fed. R.Bankr.P. 7052 and Fed.R.Civ.P. 52. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101, *et seq.*

**2.** Federal Rule of Civil Procedure 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment,

if appropriate, shall be entered against the adverse party.
Fed.R.Civ.P. 56(e).

The applicable local rule further defines a nonmovant's responsibility and prescribes the response format:

The papers opposing a motion for summary judgment shall be accompanied by a separate, short and concise statement of material facts, supported by appropriate record citations, as to which it is contended that there exist a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party, if supported by appropriate record citations, will be deemed to be admitted unless properly controverted by the statement required to be served by the opposing party.
Me.D.Ct.R. 56.

stage, I "pierce the boilerplate" of the pleadings, and "assay the parties' proof" to determine whether trial is necessary. *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992).

As movant, Chase must "properly support[ ]" its motion for summary judgment, *Barbour,* 63 F.3d at 37, advancing its argument that the two transactions targeted in Count I fit within the folds of a § 523(a)(2)(C) claim. And it must show that there is no evidence supporting Poor's position in opposition. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) ("[T]he burden on the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case."); *accord Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990).

To demonstrate triable issues of fact, Poor must go beyond "mere allegations or denials," Fed.R.Civ.P. 56(e), and must present competent evidence in the prescribed format. *See id.;* Me.D.Ct.R. 56; *also Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997) (nonmovant must respond with "more than effusive rhetoric and optimistic surmise"); *Wynne,* 976 F.2d at 794 ("This requirement has sharp teeth: the [nonmovant] 'must present definite, competent evidence to rebut the motion.' "); *accord Borschow Hosp. and Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 14 (1st Cir.1996); *Barbour,* 63 F.3d at 37; *Rogers,* 902 F.2d at 143; *Winters,* 812 F.Supp. at 2.

Since Poor failed to present this court with competent, controverting evidence, she is deemed to have conceded the material facts Chase tendered in support of its motion. *See Winters,* 812 F.Supp. at 2 (noting that a party that fails to object to a summary motion in accordance with the requirements of the local rule is "deemed to have consented to the moving party's statement of facts to the extent it is supported by appropriate record citations"); *cf.* Fed. R.Civ.P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.").

In considering Chase's well-crafted motion and Poor's meager response, I view the facts in a light most favorable to Poor, drawing all reasonable inferences in her favor, *see e.g., Barbour,* 63 F.3d at 36; *Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993), and, more important to the present controversy, I will grant Chase's motion only if it is entitled to judgment as a "matter of law" on the summary judgment record. *See* Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if ... the moving party is entitled to a judgment as a matter of law"); *also* Fed.R.Civ.P. 56(e) (outlining the necessity of a proper defense of a summary judgment motion, supported by affidavits, concluding that if there is no such response the court shall enter summary judgment "if appropriate"). Accordingly, although Poor has failed to demonstrate a factual contest worthy of trial (on the points raised by Chase's motion), under the "well established law" of this district, I must scrutinize the legal merit of Chase's summary judgment request. *Winters,* 812 F.Supp. at 2. *See also Ramsdell v. Bowles,* 64 F.3d 5, 8 (1st Cir.1995) (concluding that the court's striking of the opposition of a motion for summary judgment for failure to meet the requirements of the local rule does not preordain a ruling in favor of the movant, observing that "summary judgment is appropriate only if the record before the court establishes that the moving party is entitled to judgment as a matter of law," citing *Winters*).

### Undisputed Material Facts

Poor applied to Chase Visa for a credit card in May 1997. (Chase Mem. at 2.) The application incorporated a "Chase Visa Balance Transfer Form" inviting Poor to "[c]omplete this form today to pay off your outstanding balances at a low fixed APR of just 7.9%. You can transfer one, two, or three balances to your new Chase Visa." (Chase Mem. Ex. 3) (attached hereto as Appendix A).

Poor accepted the invitation when she applied for a Chase Gold Visa account, requesting the transfer of $3,400.00 of debt from her MBNA MasterCard and $2,600.00 from a Choice Visa account. (Johns Aff. ¶¶ 4, 5;

Chase Mem. at 3.) [3] In a letter dated June 9, 1997, Chase notified Poor that it had approved her application and had opened her new Gold Visa account with a $7,300.00 credit limit. (Chase Mem.Ex. 4; Johns Aff. ¶ 6; Chase Mem. at 2–3.) The missive went on to state: "As you requested, we are transferring the following balances to your new account: *Payee* MBNA America ... *Amount* $3,400.00 *Check* 5000 *Status* Balance Transferred...." (Chase Mem.Ex. 4.)

Poor claims to have received her Chase gold card on June 17, 1997. (Chase Mem. at 2.) Chase effected the $3,400.00 payment to MBNA by a check, (Johns Aff. ¶ 8; Chase Mem. at 3), and that check "cleared" on June 20, 1997.[4] On that date Chase charged $3,400.00 to Poor's Visa account. (Johns Aff. ¶ 8; Chase Mem. at 3–4.) On June 26, 1997, Poor withdrew $350.00 cash on credit through the Chase account. (Chase Mem. Ex. 5; Johns Aff. ¶ 13; Chase Mem. at 4.)

Although Poor's medical records are not properly before me, at oral argument Chase's counsel conceded that Poor was involved in a disabling automobile accident on June 8, 1997, and that the injuries she suffered led to unemployment. Poor and her husband filed a joint Chapter 7 petition on August 19, 1997.

*Discussion*

### The Transactions

Chase has the burden of proving that the § 523(a)(2)(C) presumption applies. *See Citicorp Nat'l Credit & Mortgage Serv. for Citibank, N.A. v. Welch (In re Welch)*, 208 B.R. 107, 110 (S.D.N.Y.1997) (noting that the proponent of a § 523(a) claim must prove each element by a preponderance of the evidence). It can obtain summary judgment only if it demonstrates that the $3,400.00 balance transfer and the $350.00 cash withdrawal qualify as § 523(a)(2)(C) transactions.

In relevant part, § 523(a)(2)(C) creates a presumption of nondischargeability for "cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title." § 523(a)(2)(C).[5] If the transactions qualify for the presumption, Chase will prevail, given Poor's failure to respond effectively on the summary judgment record.

To trigger the presumption, Chase must prove four elements. (1) The transactions must be "cash advances" within the meaning of the statutory subsection. (2) The debts must qualify as "extensions of consumer credit under an open end credit plan." (3)

**3.** The $2,600.00 transfer from Choice Visa to Chase is not before me for summary judgment. That balance transfer occurred, at the latest, on June 19, 1997, one day shy of the § 523(a)(2)(c)'s 60 day presumption period. (Chase Mem. at 4 n. 6.)

**4.** Chase asserts that the date its check to MBNA cleared was June 20, 1997, the date the payment was charged to Poor's account. The date would be relevant to a determination of when Poor "obtained" the use of Chase's funds, perhaps a critical inquiry in another case. For reasons that will become clear below, I will not reach the point today. *See infra* note 12.

**5.** The subsection's full text provides:

(2) [A discharge under the Code does not discharge an individual debtor from any debt] for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed nondischargeable; "luxury goods or services" do no include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for the purposes of this subparagraph as it is defined in the Consumer Credit Protection Act....

§ 523(a)(2).

The aggregate amount of the cash advances borrowed by Poor from Chase within the 60 day period must exceed $1,000. (4) Poor's cash advance(s) must be "obtained" no more than 60 days proceeding the order for relief. § 523(a)(2)(C).

■ Consistent with longstanding bankruptcy law principles, I will 'narrowly construe § 523(a)(2)(C)'s exception to discharge, favoring Poor's fresh start. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) ("[A] central purpose of the Code is · to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' ") (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)); *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931 (1st Cir.1995) (stressing that exceptions to discharge are "aberrations from the norm," observing the language in *Local Loan Co.* and stating: "The Code, thus, was intended to be a mechanism for liberal discharge of debt."); *Field v. Mans (In re Mans)*, 210 B.R. 1, 6 (1st Cir. BAP 1997) ("An exception · to discharge should ordinarily be construed in favor of the debtor."); *accord Kawaauhau v. Geiger*, —— U.S. ——, —— – ——, 118 S.Ct. 974, 976–77, —— L.Ed.2d —— (1998); *Aetna Fin. Co. v. Neal (In re Neal)*, 113 B.R. 607, 608 (9th Cir. BAP 1990); *In re Welch*, 208 B.R. at 110.

### a. Balance Transfer As Cash Advance?

The meaning of "cash advance" for § 523(a)(2)(C) purposes is not crystalline.

The Code provides no express definition. *See* § 101. Given the rapid growth and diversification of financial and credit services, the range of transactions that might be assayed to determine their character as § 523(a)(2)(C) "cash advance[s]" is ever-expanding.

Chase asserts that Poor's $3,400.00 balance transfer to MBNA was a cash advance because Chase treats such transfers as cash advances internally and under the terms of its cardholder agreement. (*See* Johns Aff. ¶ 14; Chase Mem. at 4.) Such a self-serving characterization is not determinative.[6]

My application of subsection (C) to the facts before me pivots on the meaning of the words "cash advance." I embark upon the task of discerning its content wary that examining the words in isolation could potentially disserve or distort the statutory design. *See O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir.1996) ("Instead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language."); *Eastern Mountain Platform Tennis, Inc. v. Sherwin–Williams Co., Inc.*, 40 F.3d 492, 497 (1st Cir.1994) ("We must glean the intention of the legislature as to the scope of the [statute] 'from its construction as a whole, not by examining isolated words and phrases.' ") (quoting *Petition of Jane Doe*, 132 N.H. 270, 564 A.2d 433, 438 (1989)).[7]

---

6. At least one court has taken issue with the importance of a creditor's characterization of the disputed transaction as a § 523(a)(2)(C) cash advance. *See Providian Bancorp v. Bixel (In re Bixel)*, 215 B.R. 772, 778 & n. 3 (Bankr.S.D.Cal. 1997) (reflecting that using a credit card account to pay off other credit card accounts was more clearly described as involving balance transfers rather than cash advances, the description selected by the creditor for use on the monthly statements). If a debtor were to argue to me that, for purposes of household bookkeeping, he or she treated cash withdrawals from an Automatic Teller Machine as "balance transfers" or something else, I would not be swayed in interpreting § 523(a)(2)(C)'s terms and purpose. What is more, Chase's assertion that it treats these trans-

actions· as cash advances must be taken with a grain of salt. Poor's July 2, 1997, Chase statement describes the $3,400.00 MBNA transaction as a "BALANCE TRNSFR" while it names the June 26, 1997, $350.00 transaction "CASH ADV." (Chase Mem.Ex. 5.)

7. A narrow focus on the phrase "cash advance" would be particularly injudicious given the term's limited pedigree. The term does not appear in *Black's Law Dictionary or Webster's Third New International Dictionary*. Nor does the term appear in the Uniform Commercial Code's definition sections pertaining to negotiable instruments and bank deposits and collections. *See* U.C.C. §§ 1–201, 3–102, 4–404. While the phrase may be gaining a more common-place

The term's scope and content must be divined "from the statute as a whole, including its overall policy and purpose." *Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995) (citations omitted). *See also Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (prescribing court attention "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy").

In short, the legislatively-intended meaning of "cash advance" depends heavily on its context. *See United States v. Rivera,* 131 F.3d 222, 225 (1st Cir.1997) (describing this as a cardinal rule); *accord McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) ("[S]tatutory language must always be read in its proper context."); *Riva v. Massachusetts,* 61 F.3d at 1007 (urging "a commonsense concession that meaning can only be ascribed to statutory language if that language is taken in context"). That context is found in the policy and purpose underlying § 523(a)(2)(C)'s enactment. It plainly appears in the subsection's legislative history. *See Summit Inv. and Dev. Corp.,* 69 F.3d at 610 ("[T]he congressional intendment conveyed by unclear statutory language may be discernable from its legislative history.").

Section 523(a)(2)(C) is aimed at what Congress identified as "unconscionable or fraudulent debtor conduct" described as "loading up" on credit card type debt through a "buying spree" on the eve of bankruptcy. S.Rep. No. 65, at 58 (1985). *See Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1092 (9th Cir.1996) ("Congress has attempted to curb the abuse of the Bankruptcy Code by debtors who engage in credit card fraud.... enact[ing] 11 U.S.C. § 523(a)(2)(C) to address the problem of the debtor who goes on a spending spree by charging the limits on his credit cards and then requests discharge of this credit card debt in bankruptcy."); *accord AT&T Universal Card Servs. v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326, 339 (Bankr. W.D.Mo.1997); *Sears, Roebuck and Co. v. Hernandez (In re Hernandez),* 208 B.R. 872, 880 (Bankr.W.D.Tex.1997); *Bank One Columbus, N.A. v. Fulginiti (In re Fulginiti),* 201 B.R. 730, 733–34 (Bankr.E.D.Pa.1996); *MBNA America v. Chrusz (In re Chrusz),* 196 B.R. 221, 223 (Bankr.D.N.H.1996) (cases discussing congressional intent in crafting § 523(a)(2)(C) to prevent debtors from "loading up" debt on the eve of bankruptcy).

Poor's transfer of her $3,400.00 credit card balance from MBNA to Chase cannot fairly be characterized as fraudulent or as part of a pre-bankruptcy buying binge. It would pervert the statute's purpose to interpret "cash advance" so expansively as to bring Poor's balance transfer within its scope. The defining characteristics of the transaction witness this conclusion.

Poor could not receive cash to spend as she pleased through completing the balance transfer boxes on the Chase application. *See Norwest Bank of Iowa, N.A. v. Orndorff (In re Orndorff),* 162 B.R. 886, 888 n. 2 (Bankr. N.D.Okla.1994) (reiterating holding "that use of an access check to pay the balance due on another credit card is not a cash advance and therefore § 523(a)(2)(C) does not apply") *overruled on different grounds by Household Credit Servs., Inc. v Peterson (In re Peterson),* 182 B.R. 877 (Bankr.N.D.Okla.1995). The absence of ready cash may not be determinative, but it is significant.[8]

Moreover, the balance transfer did not result in any increase in Poor's overall debt. A balance transfer—be it accomplished through a form incorporated into the credit application (as it was here), a telephone call, or by use of one of the plethora of "access checks"

---

street meaning, there is nothing "ordinary" about its "usage" as a statutory term. *See Riva v. Massachusetts,* 61 F.3d 1003, 1007 (1st Cir. 1995) (stating the rule of endowing undefined words with their "ordinary usage").

8. One court has held that a debtor must actually have received cash in hand for the transaction to qualify as a § 523(a)(2)(C) cash advance. *See In re Welch,* 208 B.R. at 111 (affirming bankruptcy court's determination that the § 523(a)(2)(C)

creditor/plaintiff "needed to establish the actual cash advances [the debtor/defendant] received through ATM withdrawals or by drafting checks for 'cash' "). Although *Welch's* conclusion accords with the First Circuit's preference for a "literal approach to interpretation of a statute," *In re Mans,* 210 B.R. at 6, I need not go so far as to dispose of Chase's motion on the record before me. *See infra* n. 10.

that credit card issuers so readily provide their customers—is, ostensibly, an attempt at debt management. *See cf. Huntington Nat'l Bank v. Lippert (In re Lippert)*, 206 B.R. 136, 141 (Bankr.N.D.Ohio 1997) (denying creditor's § 523(a)(2)(A) claim, reasoning that using cash advances from one credit card account to pay the balance of another did "not appear designed to enable [the debtor] to pyramid debts he did not intend to pay"); *General Elec. Capitol Consumer Card Co. v. Janecek (In re Janecek)*, 183 B.R. 571, 575–76 (Bankr.D.Neb.1995) (debtor's ten year practice of using credit cards to keep himself afloat demonstrated that the two cash advances at issue were not part of a scheme to deceive creditors by accumulating

unsecured debt with no intent to repay); *Citibank (New York State) v. Davis (In re Davis)*, 176 B.R. 118, 121 (Bankr.W.D.N.Y. 1994) (cash advance debt dischargeable; debtors received no new benefit from the credit, but "merely substituted new obligations for old ones").

Indeed, Chase solicited Poor's business, offering her the "benefit" of debt consolidation at "a low fixed APR." Standing alone, a debtor's exercise of such an option demonstrates a desire to make debt repayment more affordable (and therefore more likely), rather than an attempt to abuse the card issuer's credit offices.[9]

Finally, Poor's balance transfer did not increase her total debt; it did not decrease

---

**9.** This case's profile is not dissimilar from others that have led courts to condemn, roundly, credit card issuers' practices.

One court recently characterized a credit card company's enticement of a debtor to consolidate bills and buy consumer goods through the use of access checks as "commercial entrapment." *Bank One Columbus, N.A. v. McDaniel (In re McDaniel)*, 202 B.R. 74, 79 (Bankr.N.D.Tex. 1996). It stated:

In this case, the Bank sent a financially strapped Debtor an enticement to consolidate bills and to purchase holiday gifts, bolstered by emphasis on a low interest rate and an increased credit limit. The Bank cannot now be heard to complain that the Debtor committed fraud by doing the very thing the Bank touted—getting cash advances to pay other bills. To allow the Bank to prevail in this situation would result in converting dischargeable debts into nondischargeable debts and would amount to this court condoning commercial entrapment.

*Id. See also In re Davis*, 176 B.R. at 120 (criticizing industry lending practices and observing that such practices color the § 523(a)(2)(A) analysis).

Knowledge that a debtor carries significant debt is inherent in a card issuer's solicitation of a new customers by offering a balance transfer option at an attractive interest rate, as was the case in Chase's solicitation of Poor. *See In re Eashai*, 87 F.3d at 1092–93 (O'Scannlain, J., concurring) (observing that credit card industry practice of encouraging the transfer of debt at lower interest rates increases the likelihood that consumers will become "overextended," and remarking that debtors genuinely overextended as a consequence of such practices should not face nondischargeability).

In addition, it has become obvious that § 523(a)(2)'s framework is an awkward fit for determining dischargeability of modern credit card obligations. Assuming that the § 523(a)(2)(C) presumption does not apply or that the debtor successfully rebuts it, the creditor

must go on to prove all the elements of fraud. Of course, there are instances of credit card splurges and kiting schemes that justify a nondischargeability determination. *See e.g., American Express Travel Related Serv. Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1126 (9th Cir. 1997), *In re Eashai*, 87 F.3d at 1088–92. But, as often as not, the court is confronted by debtors who have used credit card services, thrust at them by competing companies, in sincere, though rarely sound, efforts to make ends meet. *See e.g., In re Lippert*, 206 B.R. at 141 (concluding that credit card access check debt was dischargeable, observing that paying balance on one account by using access check from another "permitted the Debtor to postpone the day of reckoning"); *In re Fulginiti*, 201 B.R. at 734 (determining that the use of a cash advance to buy replacement windows and to pay other bills was not an attempt to "load up" debts but was more aptly described as "a straw that overloaded and, figuratively speaking, broke the Debtor's back"); *Barnett Bank of Pinellas County v. Tinney (In re Tinney)*, 188 B.R. 1015, 1020 (Bankr. M.D.Fla.1995) ("The availability of credit for difficult financial times is one very good reason to establish credit. The test for nondischargeability is not whether credit was used in difficult times; the test for nondischargeability is whether the credit was used with the intent not to repay."); *In re Davis*, 176 B.R. at 121 (use of credit card cash advances was not fraudulent when used to pay other obligations, rather it "prolonged the agony of [the debtors'] fiscal troubles, and delayed further the relief of a fresh start in Chapter 7"). *Accord e.g., AT&T Universal Card Servs. Corp. v. Harris (In re Harris)*, 210 B.R. 617 (Bankr.M.D.Fla.1997) (cash advance to buy illegal drugs); *AT&T Universal Card Servs. Corp. v. Totina (In re Totina)*, 198 B.R. 673 (Bankr. E.D.La.1996) (cash advances to pay gambling debts); *Chevy Chase Bank, FSB v. Briese (In re Briese)*, 196 B.R. 440 (Bankr.W.D.Wis.1996) (credit card debt arising from gambling habit).

the potential liquidation distribution to her other creditors. *See Thorp Credit, Inc. v. Smith (In re Smith)*, 54 B.R. 299, 303 (Bankr.S.D.Iowa 1985) (noting that one of the congressional reasons for discouraging "loading up" it to prevent diminution of payment to all creditors in the Chapter 7).

■ Thus, I conclude that Poor's utilization of the balance transfer option offered her by Chase is without the scope of § 523(a)(2)(C)'s presumptive nondischargeability for cash advances.[10] Because the balance transfer does not qualify as a "cash advance" under § 523(a)(2)(C) as a matter of law,[11] Chase is not entitled to summary judgment as to its $3,400.00 claim.[12]

**b. *The $350 Cash Advance.***

■ Had Chase successfully invoked § 523(a)(2)(C) against the $3,400.00 balance

transfer the June 26, 1997, $350.00 credit cash withdrawal would be presumptively non-dischargeable as a "cash advance" and, therefore, ripe for summary judgment. Chase has advanced a sufficient factual predicate for such a determination and Poor has acknowledged the timing and nature of the transaction. However, as it is the only qualifying cash advance debt owed Chase by Poor it falls below § 523(a)(2)(C)'s $1,000.00 threshold. Therefore, Chase's motion must be denied as to this debt, as well.

### *Conclusion*

For the reasons set forth above, Chase's motion for partial summary judgment is DENIED. A separate order will enter forthwith.

---

10. My determination leaves for another day the scope of § 523(a)(2)(C) when applied to transactions that are more akin to a cash-in-hand transaction. For instance, the use of an access check written by the debtor directly to a creditor to pay an existing credit card balance is not a far cry from the transaction before me today. But use of the same check to pay a vendor for new purchases seems little different from taking an in-hand cash advance.

11. The case before me demonstrates good reason for construing § 523(a)(2)(C) narrowly. Section 523(a)(2) actions are fraud actions. *See Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Such actions generally require fact-intensive inquiry. *See e.g., In re Ellingsworth*, 212 B.R. at 334–35; *In re Orndorff*, 162 B.R. at 889–90 (cases enumerating twelve factors in a "totality of circumstances" test for determining whether debtor's use of access checks created nondischargeable debt). Absent a nonmovant's default or reliance on "conclusory allegations, improbable inferences and unsupported speculation," summary judgment is an inappropriate vehicle for resolving actions where motive or state of mind are critical elements. *See Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994).

If the § 523(a)(2)(C) notion of cash advance were broadly applied, creditors might utilize the section, employing summary judgment process, to obtain nondischargeability judgments in circumstances where a probing inquiry would disclose that the evils Congress sought to exorcize are utterly lacking.

The case before me is a case in point. Given the summary judgment facts, including the facts conceded by Chase at oral argument, Chase faces almost certain defeat if it must litigate its case on the merits. In addition to proving all the other

elements of fraud, it must prove that Poor, who was injured in a car accident after filling out a credit application and balance transfer request, had fraudulent intent because she did not leap from her sickbed and call Chase to cancel a transaction it had solicited—one that did not involve increasing her overall debt or making new purchases—before it was finalized on Chase's books.

12. With Chase's failure to meet this element of § 523(a)(2)(C) with respect to the $3,400.00 balance transfer, I need not examine the transaction in light of the remaining three factors. I do note that the amount of the transaction exceeds the presumption's $1,000.00 threshold. Also, Poor and Chase appear to be parties to an open end credit plan. *See ITT Fin. Servs. v. Woods (In re Woods)*, 66 B.R. 984, 990–91 (Bankr.E.D.Pa. 1986) (discussing and applying the elements of an open end credit plan pursuant to 15 U.S.C. § 1602(i) in the context of § 523(a)(2)(C)).

It would be less easy to conclude that the $3,400.00 transaction fell within the 60 day presumption period. Chase argues that Poor obtained the cash advance on the sixtieth day preceding bankruptcy. Its only evidence on that point is that June 20, 1997, was the day that the transaction was posted to Poor's Chase account. (Chase Mem. at 4; Johns Aff. ¶ 8.) Given Chase's June 9, 1997, letter to Poor describing the check as "transferred," it is likely the payment was credited to Poor's MBNA account earlier than June 20. Thus, Poor might have "obtained" the credit outside the 60 day presumption period. Given the sparsity of the summary judgment record on this point, and having decided that the transaction is not a "cash advance," I need not address the issue.

APPENDIX A

**Chase Visa Balance Transfer Form**

Complete this form today to pay off your outstanding balances at a low fixed APR of just 7.9%. You can transfer one, two, or three balances to your new Chase Visa.